## No. 8368.

## MARY GODDEN VS. THE EXECUTORS OF EDWARD BURKE ET ALS.

A testator gave instructions to his lawyer of his testamentary dispositions, who reduced them to writing. The next day, before the notary and witnesses, one of the latter read from this memorandum to the testator, who repeated the words as uttered to the notary in the presence of the other witnesses; the testator not being able from some transient cause to read the manuscript. *Held*, this was a dictation of the will within the meaning of the Code. There was no suggestion that the will was not in literal conformity to the memorandum, and none that the memorandum was not a faithful expression of the testator's instructions.

If the testator be shown to have been of sound mind and disposing memory at the time of confecting the will, eccentricities of conduct and even partial aberration at other times will not affect his testamentary capacity.

It is, and should ever be, the aim of Courts to give effect to wills. Testamentary freedom is too valuable and sacred to be interfered with, and will not be, when testamentary capacity is shown to exist, and the forms of law are complied with.

Testamentary capacity is the ability to comprehend the conditions of one's property, and the testator's relations to those who may naturally expect to become the objects of his bounty.

APPEAL from the Civil District Court for the Parish of Orleans. *Tissot, J.*

*W. S. Benedict* for Plaintiff and Appellant.

*E. H. Farrar* for Defendants and Appellees :

1. Where a non-expert witness is under examination as to the sanity or insanity of a testator, he is limited to the statement of bare facts, and is not allowed to give his opinion of the mental soundness or unsoundness of the *de cujus*. 1 Gray, 337; 34 N. Y. 190; 42 N. Y. 270; 1 Barb. 408; 13 Tex. 568; 2 Allen, 511; 3 Mass. 371; 9 Mass. 225.

2. The only exception to this rule is in favor of the subscribing witnesses to a will. 8 Greenl. 42; 3 Mass. 330; 12 Penn. St. 27; 54 Penn. St. 216; 78 Penn. St. 326; 36 Ga. 64.

3. In some cases a witness, after stating specific facts, has been allowed to say what impression only those specific facts, as stated, made on his mind. 3 Mass. 380; 8 Mass. 371; 9 Mass. 225; 9 Conn. 102; 2 Stockt. Ch. 186; 1 Greenl. Eq. 82; 2 Greenl. Eq. 563; 34 N. Y. 155; 34 N. Y. 190; 7 Serg. & R. 90; 9 Yerger, 319; 7 Md. 65; 5 Blackf. 217; 6 Ga. 324; 7 Ga. 242; 14 Ga. 242; 17 Ala. 618.

4. The enforcement of these rules in the court below would have excluded a mass of worthless and irrelevant testimony.

5. The law presumes a man sane until he is proven insane. 32 An. 1055.

6. Where a will is attacked, on the ground of the insanity of the testator, the burden of proof is on the assailant of the will, and insanity must be proven positively and affirmatively. Ibid.

7. Neither disease, nor age, nor physical feebleness, nor a slight impairment of the memory or the other mental faculties, will justify a court in setting aside a will. Ibid.

8. Where the pleadings put at issue nothing but the sanity *vel non* of a testator, the court will not allow counsel to raise in argument a question as to the formality of the will, based on evidence adduced under objection.

9. A testator may have his will prepared by a lawyer, and then either read it himself to the notary, or dictate it to the notary by having it read to himself by some other person. All that the law requires is that the notary shall take the substance of the will from the lips of the testator. That was done in this case. Landry vs. Thomatis et als., 32 An. 113, and authorities cited in syllabus of defendants' brief in that case.

*Thos. J. Semmes* on the same side.

The opinion of the Court was delivered by

BERMUDEZ, C. J. The plaintiff, as the only lawful issue of Edward Burke, attacks her father's will and seeks its nullity on two substantive grounds: 1st, unsoundness of mind and mental incapacity; and 2d, undue influence on the part of the universal legatee, his brother.

The executors named and all concerned in maintaining the will were made parties.

Their defense is a general denial, and the special averment that all that portion of plaintiff's petition which charges that the will was made through the instrumentality or at the suggestion or captation of the universal legatee is, even if true, which they deny, not susceptible of proof under the laws of Louisiana, and that evidence tending to show such allegations to be founded in fact, must be excluded.

The wide door opened by the lower court has permitted the litigants to accumulate written evidence and oral testimony, swelling the dimensions of the transcript to upwards of one thousand pages, some fifty witnesses testifying in the case during a protracted trial.

For reasons orally assigned, which were not, therefore, embodied in the transcript, judgment being rendered in favor of the defendants, the plaintiff has appealed.

While we well appreciate the feelings of defendants' learned counsel in his deprecation of this enormous record, we are placed in the necessity, under the law governing such cases, of overruling *in globo* the many bills of exceptions with which the defense has come up to us, and which were taken to exclude certain testimony on the issue of insanity.

It is no doubt a rule of law, that in questions of insanity, non-expert witnesses are required to state the facts which have come under their observation, and are not permitted to express mere impressions or opinions; but the law allows them to announce the result impressed

upon their minds by the occurrences specifically testified to by them. An exception to the rule is made as to witnesses subscribing a will. Professional experts themselves, although authorized to express a scientific opinion, must make known the circumstances upon which it is based, whether the facts be or not to their personal knowledge. They are rather generally called upon to utter a judgment upon given or stated facts.

The philosophy of the law is, that it is for the court to draw conclusions from the established facts. Chandler vs. Chandler, 21 An. 58, and authorities there cited.

It was under the guidance of those well settled and wise rules that the District Judge has permitted the testimony complained of to be received, and has thus enabled this Court to pass upon and weigh the statements of a number of witnesses belonging to different classes of society, among whom are found a cotton screwer, a plasterer, a milkman, a barber, an ironmonger, a barkeeper, a jeweler, a watchmaker, a pedagogue, a priest, a doctor, a druggist, a lawyer, a notary, one of his clerks, a bank president, bank employees, a wife, a daughter, store clerks, body servants, tenants, customers and friends. We think the evidence was properly admitted.

We are next requested to notice that the petition avers no defect of form in the will; that when the plaintiff attempted to go into the mode and manner of the making of the will the defendants objected, and that their objection is put of record. An inspection of the entry of the objection shows that it was made after the most material portion of the testimony on the circumstances which transpired at the making of the will, had been introduced by the defense itself, and that it was urged on the ground that the testimony was irrelevant and not pertinent.

The charge that "the pretended will was made through the instrumentality of Augustin Burke," substantially includes that of undue influence in the procurement of the will. It is true that the allegation might have been made more explicit, but the defendants did not except and call for a declaration or enumeration of the facts and circumstances justifying the charge. Far from doing so and considering that the petition was pregnant with such charge, the defendants themselves, in their anxiety to close the door against any evidence to prove suggestion of the will, found that the petition charged besides, suggestion and captation. Denying the same, they specially pleaded in their answer that such charge was not susceptible of proof under the law of the State.

On the trial, relying on this defense, they objected to evidence offered to show suggestion at the time of the making of the will.

To that end they rely on Article 1492 R. C. C., which declares that "proof is not admitted of the dispositions having been made through hatred, anger, suggestion or captation."

It is an error to suppose that this Article, which was first incorporated in the Code of 1808, and which finds no place in the Napoleon Code, was designed to prevent the admission of proof to establish the circumstances which transpire *at* the making of an authentic will, under charges tending to the nullity of the act, for want of compliance with the exigencies of the law. The prohibition embodied in that Article against the admissibility of certain proof, was intended to apply only to facts arisen *prior* to the making of the will and to close effectually the door against inquiries into the motives which animated a testator in disposing of his property. It does not at all forbid the introduction of proof to show facts which occurred *during* the making of the will, such as: that the will was not dictated by the testator, but was suggested to him, in part or in whole, either by the notary, one of the witnesses, or somebody else in attendance. In other words, it permits the hearing of evidence of suggestion, of prompting; *i. e.*, that in the "*dictation*" to the notary, the testator performed the part of an automaton. Unless it was so, it would ever be impossible to prove that the dictation was the result of intimidation, fraud, or some other ill-practice, or to establish some other fatal irregularity.

The record discloses the fact that while the notary, a witness for defendants, was on the stand, testifying as to the will in question then before him, he was asked by the defense to "state the circumstances under which that will was made," and that he did so. It also establishes that one of the subscribing witnesses to the will, sworn for the defendants, was by them asked to "state the whole history of the making of the will," and that he did so. It also shows, that when the universal legatee, sworn for himself, was on the stand, he was asked by his counsel to state what happened on the 3d of June, the day of the making of the will, and that he did so, including the making of the will, at which he was present.

It is only *after* such questions had been put by the defense and answered, that the plaintiff propounded, on the cross-examination, questions, in order to elucidate or establish more clearly the circumstances which transpired during the will making ceremony.

The allegation of the petition: that the will was procured by the instrumentality of Augustin Burke, the universal legatee, was amply broad to justify the offering and admission of explanatory proof of subordinate facts, substantially found within the allegations.

As the defense had first instituted inquiry as to those circumstances,

it was perfectly legitimate for the plaintiff to have availed herself of the opportunity and by cross-examination to have elicited facts from the witnesses of the defense, whom she might have apprehended putting on the stand, in her own behalf. The defense should not have made an opening for the cross-questions. As these were provoked, they were properly allowed to be put and answered.

· If the allegation in plaintiff's petition was vague, its insufficiency was remedied by the answer and by the examination by the defense of witnesses to show the circumstances under which the will was made, which were matters implied by the nature and object of the action. 9 L. 322; 7 R. 121; 14 L. 189; 6 An. 531; 7 An. 48, 84; 14 An. 81; 19 An. 516.

The testimony introduced, under such circumstances, has produced the effect of enlarging or expanding the somewhat unsatisfactory allegation of the petition. That averment was no doubt such as could have been amended by a supplemental petition.

It is the policy of the law, in its abhorrence of a multiplicity of actions for the same purpose, that all facts tending to terminate a controversy touching one object should be introduced, considered and finally adjudicated upon, in order to set differences on that subject forever at rest.

*Interest reipublicæ ut sit finis litium.*

The object of pleading is to inform the opposite party of the nature of the demand, or of the resistance; and to foreshadow an intention to substantiate it by evidence, that he may not plead surprise, and be prepared to rebut. Pertinent evidence, under substantial allegations announcing it, of whose existence and probable production the adverse party was aware, or was presumed to be, cannot therefore be excluded. It can the less be so, when it is elicited by cross-questions, touching important matters brought to light in the examination in chief. The party who instituted the inquiry cannot, after establishing the facts revealed, be permitted to close to his adversary the door which he himself had thrown wide open. What is legal for the one, cannot be illegal for the other litigant. They must have equal rights.

It is therefore a well established rule, that parties are bound by the evidence introduced by them on a material point, although not strictly presented by the pleadings. 6 N. S. 86; 1 L. 301; 18 L. 321; 9 An. 254; 15 An. 304, 389; H. D. 493, 1155, 1157; L. D. 234, 541, 542.

The Court, after having been made to hear and invited to pass upon facts elicited by the parties, either under allegations which were actually made, or which might have been made, conducive to a final determination of the object of the controversy, has a right to and should

Godden vs. Executors of Burke.

adjudicate upon those facts as fully as though received under specific averments.

The judgment rendered under such circumstances becomes a conclusive bar to a reinvestigation of the matters agitated. Heroman vs. La. Institute, No. 8182, lately decided on rehearing, 34 An. 805; H. D., and authorities there cited.

This ruling leads us to the consideration of the merits of the controversy, which itself, as already stated, rests upon two distinct charges, either of which, if proved, would be sufficient to procure the annulment of the will attacked.

It is clear, that if, on the one hand, the testator was of unsound mind and mentally incapacitated at the moment of making the will, the instrument must be declared inoperative; and that, on the other hand, if, without being of unsound mind and mentally incapacitated, the testator did not dictate the will in the manner and form required by law, the act must likewise be declared of no effect.

We propose to pass mainly upon the first charge and to consider and determine whether the testator was in a condition to dictate, and did spontaneously dictate his will, as the law demands.

We have waded through the voluminous transcript and remain satisfied that the written evidence and the oral testimony introduced establish the following conspicuous, or stubborn facts, which remain uncontradicted:

Edward Burke was born in Ireland, in 1802; was, therefore, in his seventy-eighth year on the 13th of June, 1880, when he died. He came over to America some fifty years ago; he went to Patterson, New Jersey, where he married and had one child, the plaintiff, who still lives there. His wife dying in 1836 or 1837, he came to New Orleans, married again, but had no children by his second wife, who survived him. Augustin Burke, the youngest brother of Edward Burke, the main defendant in this suit, has no children and is worth $70,000. Their intercourse was friendly, although on certain occasions not so. They subsequently reconciled their differences. Edward Burke did a substantial business in New Orleans and accumulated a fortune approaching one hundred thousand dollars at his death.

In the last days of December, 1879, he was afflicted with epilepsy, the first attack of which was of such violence that it suggested to him the probability of impending death, the propriety of making his last will, which he made on the 30th of the same month. He declares in it, that he is married, that he has a daughter, who is his forced heir, and that he bequeathes all his property to his surviving consort, instituting her his universal legatee, after making a few legacies. Three

days afterwards, by writing, in the same instrument, he revoked and annulled all wills made by him.

His health continued to fail rapidly. The epileptic fits returned periodically, his memory became affected, he ceased to recognize persons, even a body or house servant, he suspended doing business, was unable to count money, to discriminate between the different articles of daily food, and was subject to hallucinations which it is unnecessary presently to mention.

On the 1st of June, 1880, Augustin Burke, who had been telegraphed to, arrived in New Orleans, from Scotland, which he had left on the 16th of May previous. He found Edward Burke waiting for him at the depot. They went home together by the street car. On the same day they went out together, called at the office of Edward Burke's legal adviser, but did not find him. They returned home. The next day they went out again, found the counsel, who, after hearing both, drew up the form of a last will and testament. They returned home. On the next day, the 3d of June, they went out together again to the same place, where a notary keeps his office.

Edward Burke, Augustin Burke and three gentlemen went to a room up stairs, the notary following shortly afterwards. No conversation passed between the notary or either of the witnesses or Augustin Burke and Edward Burke. One of the witnesses sat by Edward Burke, holding in his hand the paper on which the day previous the counsel had drawn up the form of testamentary dispositions, prompting to Edward Burke each and every word on it, which Edward Burke, from first to last, repeated, and which the notary took down, one after the other, just as they were uttered.

After the writing was through, the act was read by the notary to Edward Burke and to the attending witnesses, and was next signed by all of them. When the ceremony was over the company parted, the notary and witnesses (his clerks) returned to their office and the two brothers returned home.

It had been decided that Edward Burke should leave for Europe on the 8th of the same month. Early on the morning of that day Edward Burke got up, went down stairs to the rear portion of his store and there cut his throat with a razor. Five days afterwards he died.

The instrument containing the words uttered by Edward Burke before the notary on the 3d of June, mentions several legacies, amounting together to $6,000, gives to the plaintiff the third which the law allows her as a forced heir, and institutes Augustin Burke universal legatee. On its face, the act, reciting as it does, the fulfilment of all legal requirements, would appear to be unassailable for any defect of external form.

Godden vs. Executors of Burke.

It is not our object to transcribe into this opinion the bulky testimony of the witnesses heard on the trial of the case. We merely propose to cull from the main declarations of fact and of opinions made by those witnesses.

We find that three witnesses, who state facts which have come to their observation, and have known Edward Burke for thirty years, testify to the disorder of his mind; that a friend who knew him for twenty years testified to the same purpose; that two others who have known him for ten years declare to the same effect; that he was considered by them as being of unsound mind and unfit for business, not knowing what he was about; that his clerks or employees were convinced to the same end; that his wife and his two servants, inmates of his residence and in constant attendance upon him, who had the best opportunities for observation, knowledge and judgment, testify conclusively not only to his want of intelligence, to the causes of his decline, to his hallucinations, but to the admissions and declarations of Augustin Burke himself, touching the intellectual derangement and incompetency of Edward Burke, as well when he first saw him on the day of his arrival as subsequently.

We have also considered the testimony of the doctor who attended Mr. Burke. He inquired, when he was on the stand, whether he was examined as an expert, and was answered that he was examined as a witness. He did not see Burke between the 28th of May and the 8th of June. He testifies touching the first epileptic attack and to seeing Burke twice or three times a month. He shows a weakness of memory. He does not and could not contradict the testimony of other witnesses as to what occurred between the day of the arrival of Augustin and that of the attempt at suicide.

We have also considered the testimony of the universal legatee, of the special legatees who were heard in their own behalf and who have some concern in having the will maintained.

We have considered that of the legal adviser and of the notary and can well imagine how, under the circumstances, their attention not having been called to the mental condition of Edward Burke, they thought themselves authorized to act as they have done, having no reason to suspect an intellectual or moral disturbance in the person appearing for a passing moment only before them.

We have not failed to examine besides the testimony of the other witnesses who testified on the trial. That of the bank president, bank clerks, druggist, store clerk, as well as that of the priest, are in the negative. It does not impeach or contradict in the least the affirmative testimony of plaintiff's witnesses, touching what did and did not take

place in their presence, particularly between the end of May to the early part of June and to the day of Burke's death. The priest, who heard his last confession, would not answer the question as to the mere fact whether he had heard Burke's confessions during the six months preceding his death. He testifies to the effect that Burke told him that in May he was to cross the ocean, that he gave him several times hearty shake hands and joked with him. This ecclesiastic does not show that he saw Burke while his brother Augustin was here, in the early part of June. What he says touching the condition of Burke, after the attempt to commit suicide, is insignificant and can have no bearing on the question of unsoundness of mind at the time of making the will, for days previous. The fact that he administered the consolations of religion proves nothing, as they are given even in cases of doubtful consciousness and even *in extremis.*

As a rule, the testimony of the defense is negative in character and is not at all such as can be successfully invoked to weaken, and still less to impeach that of the plaintiff.

We are satisfied that the proof offered and admitted shows that the mind of Edward Burke, for some time previous to the 3d of June, 1880, was generally and habitually unsound, and that he was mentally incapacitated from business transactions, and that the will attacked was not proved by the defendants, on whom the burden rested, to have been made during a lucid interval.

From the whole, including what transpired at the making of the will, we therefore feel firm in the conviction that Edward Burke was not in a condition to make his will, and that the instrument which purports to be the depositary of his last intentions is not such and is not to be executed.

We would here rest with satisfaction our investigations and conclusions were it not for the loud and violent denunciations made of the wife, of the servants, and of the clerks who have testified in the case. It is claimed that they have falsely sworn that, for months before his death, Mr. Burke could not read and write, transact business, count money, do any rational act; that his hands and features twitched, that his eyes rolled in such a way that nobody who had ever known him could meet him on the street and not see that he was insane. It is said that the testimony of those witnesses has been so completely destroyed, that not a shred of it remains. In justification of the demolition, it is shown that Mr. Burke had a bank book, wrote out deposit lists, drew checks, as late as May 4th, and that he wrote a kind letter to his brother on the 22d of April previous.

This of itself is insufficient to impair the testimony of those persons, who did not assume to swear to what had taken place out of their presence; they only swore to what was to their knowledge and as far as they knew. How, indeed, could they swear otherwise, that Mr. Burke had done no business or writing out of their presence? Depositing money in bank and drawing checks are somewhat mechanical operations, requiring very little intellectual exertion, and are surely no exclusive touchstone of the soundness of a person's mind. Besides, the evidence shows that the last check was drawn on the 4th of May, many days before the violent epileptic attack which took place in the course of the month and lasted two weeks, during which he remained in bed.

The two servants say, blending their testimony together, that in the latter part of his life Edward Burke was subject to fits, which affected his health. Towards the end of his life, in May particularly, he would know nobody; he could not distinguish meat from potatoes or from fish, salt from sugar, brandy from water; that he would try to put on pillow cases and pocket handkerchiefs for shirts; would go around the room in the night drilling, militia drilling; speaking about fighting, having a great battle, fighting dogs; that he would buy cotton shirts unnecessarily when he had a quantity of the finest linen shirts at home; that he would chalk his shoes all around and then cut them; that Augustin Burke remarked once: In the name of Jesus Christ, ain't I to be pitied, to come across the ocean to take charge of a maniac; that Augustin Burke threatened to take his brother to the Louisiana Retreat in this City, which is a private refuge for insane persons of some means; that on one occasion Edward Burke tried to throw a plate at Augustin at the table, while the latter was offering him some meat; that he did not attend to business, that his wife and the clerks did so for him; that he would have black alpaca sewed on his socks; that Mrs. Burke was in the habit of tying his night shirt to her wrist to prevent his getting up without her knowing it; that his mind was completely gone; that he was perfectly insane.

Their testimony is corroborated in all its important particulars by two of the clerks in Burke's employ and by his widow, all of whom are disinterested.

One of the clerks says, that during the last months of Edward's life, people living in the neighborhood, with whom he was well acquainted, would come to his store and speak to him and he would not know them; that Augustin told him that he thought Edward's head was affected; that Edward once called Augustin a scoundrel and did not seem to want him near him.

22

Mrs. Burke says that, during the six months preceding her husband's death he was subject to convulsions or fits, the first of which occurred some fifteen months previous, in March, 1879; that from that time his mind was affected; that in the beginning he was very violent and that the weakness kept on increasing; he did not attend to business; she kept accounts and the boys attended to the business; for three months before his death she attended to everything; when he wanted to go out she would send somebody after him; he did not know what he was talking about; he had a book which he was fond of reading and burnt it, never mentioning it afterwards; everything he did was strange; he did not know the time of day; with his watch in hand he would say it was four o'clock when it was eleven; did not know the top of the house from the floor; she would pin his night shirt to her wrist to prevent him from getting out unknown to her at night; that he was worried about a dispatch received from Augustin Burke in the end of May; that when Augustin arrived he told her that he had met Edward Burke at the depot; that it was as much as he could do from shedding tears; that Edward's mind was entirely gone, he was sorry to say; that Augustin threatened placing Edward in the Louisiana Retreat and said, with an oath, ain't I to be pitied, to come across the ocean to take charge of a maniac; that her husband, during his last days, imagined he was fighting dogs, that he had killed many; would not remember from one minute to another what he was saying; did not seem to care for or notice anything; he was unable to count money; he was as crazy as he could be, and could not be any more.

We think that the testimony of these witnesses, who were nearest to Edward Burke, who had constant and the best opportunities for judging, and that of other witnesses superadded, establish more than *prima facie* that Edward Burke was of unsound mind and mentally incapacitated from making a valid will.

There exist two glaring, convincing facts, which stare in the face, besides the deplorable mental disorders just considered and the circumstances in which Edward Burke made his will, and they are: 1st, the unwise and injudicious manner in which he apparently bequeathed the bulk of his estate; and 2d, his lamentable attempt at committing suicide, followed shortly after by his death.

That a man owning $100,000 and having a community half interest therein at his demise, the father of an only child, somewhat advanced in life, having children, living separate from her husband, a machinist, who is in a foreign distant land striving for a living, a daughter, the fruit of his first love, against whom he had not a word of complaint to utter, to whom he has at all times failed in liberality and assistance, should, at the hour of appearance before his Maker, leave nothing to her

beyond the *pittance* of which the law in its humanity forbade him from stripping her; that he should, after making a few insignificant legacies, leave the rest of his estate to a wealthy brother having no children, living abroad, and nothing to his other relatives, is indeed strange and unnatural, and does violence to well conceived ideas and customs for the transmission of property by last will.

The fact of that brother hurrying from across the ocean to the death-bed of the old man, of his never leaving him while here, of his going with him three times to law offices, assisting at the making of the will, not whispering a word about it until after death had stilled the testator's mouth; the fact of that brother determining to take the invalid old man, in his advanced age, on a trying journey across the stormy ocean, alone, without his wife, who had shared the smiles and frowns of his fortunes, who had stood by him and cared for him in his estrangements, coupled with the horrifying culminating incident of the attempt at suicide, point dreadfully, but correctly to the inference, if not proof, that the poor demented was laboring powerless under the influence, the pressure of his brother, and in the desperate use of what little energy was left him, preferred to die rather than to follow and be controlled any longer.

Suicide, it is true, is not, as an inflexible rule, considered in itself as evidence of insanity, but it cannot be denied that in most cases it is committed in moments of mental aberration, and is an act which nothing can otherwise justify.

It is manifest that, under such a state of things, the burden of proof was upon the defendants to show, if such was truly the fact, that the will was made during a lucid interval. R. C. C. 1783, (9); 6 An. 108; 21 An. 58; 4 Cowan, 207; 6 Cald. (Tenn.) 21; 1 Paige, 171; 28 Md. 15; 9 Pa. 151; 36 Ind. 69; 1 B. Mon. 263; XIV U. S. Digest, 306, (1384).

The testimony and written evidence introduced by them has not thrown any doubt on the question of insanity; that of Augustin Burke, the universal legatee, which assumes to contradict the depositions of the clerks, the servants and the widow, is of the weakest kind. It vacillates when it should have been positive and peremptory, and far from affecting, rather corroborates what those persons have said. The excitement under which it is said they were, when testifying on the stand, may be well understood and explained by the invasion of their hearts by feelings of surprise and indignation on the discovery of the manner in which the estate was apparently to go. They are disinterested and uncontradicted.

The defendants have attempted to show that the will was made in a lucid interval, but they have not succeeded. The very manner in

which the will was made, the prompting of it, word by word, by the witness to Edward Burke and repeated by him as suggested, clearly demonstrate that he was not in a condition to make a *spontaneous* declaration of his last intentions, and have them followed and written down.

That will was not a will *dictated* by a testator, as the law requires. It was a will dictated *to* a testator and repeated by him like an automaton.

The very definition of the word testament, (*testatio mentis*) in the Roman law, shows that it is an act which must contain the spontaneous manifestation and free expression of the testator's volition.

*Testamentum ut voluntatis nostræ justa sententia, de eo quod quis post mortem suam fieri vult.* Modest, D. 28, ii ; Ulpian Reg. 20, §.1 ; Ortolan Just. 1, 522 ; L. 11, t. x.

Coin Delisle on Donations and Testaments, p. 370, No. 8, says :

" Il n'y aurait pas dictée, dans le sens moral, quoique le testateur eût prononcé ses dispositions à haute voix et qu'elles aient été écrites mot à mot, si une personne présente à l'acte et remplissant, en quelque sorte, le rôle de souffleur, avait, en présence du notaire, inspiré au testateur les dispositions que celui ci a fait écrire. *Cette espèce de dictée en sous ordre* serait privée du caractère de *spontanéité* dont les coûtumes, l'ordonnance et le Code Civil ont voulu donner la certitude." Also, No. 2 ; Toullier 5, No. 410 ; see Ricard, part. 3, No. 52 ; Marcadé 4, pp. 13, 14 ; Demolombe, v. 21, p. 237 ; v. 4, p. 240 ; Duranton, v. 9, p. 12 ; Mourlon, v. 2, p. 399.

In the early case of Hamilton, 6 N. S. 144, the Court said, through Judge Martin, that the requirement of dictation means " that the testator must express his intentions orally, not by signs, but by words and not upon suggestion."

The decision in the case of Landry vs. Tomatis, 32 An, 113, was made under a very different state of facts. There was no dictation to the testatrix of every or any disposition, from beginning to end, and repetition by her, word by word, of the suggestions, as in this case. She was assisted by her counsel, who served as a witness and who merely suggested words, merely to assist, occasionally, which it was perfectly legitimate and lawful for him to do. Coin Delisle, p. 371, No. 12, end of second paragraph ; Ricard, No. 55.

In the case of Marigny, 16 An. 267, the Court would not hold that there had been a dictation and maintained the will, which was made in the authentic form, merely as a nuncupative testament, under private signature, holding that where the will is merely presented, not only the presentation need not be manual, but that the law does not require proof of a dictation out of the presence of the witnesses. The

will of Mrs. Marigny had been drawn up by a notary, in presence of *four* witnesses, from a written *memorandum* or paper which the testatrix had handed, and which, after being read to her by the notary, had been transcribed by him ; next, reading paragraph after paragraph, and last, the whole as copied from the paper. In their inability to consider that the will had been dictated, the Court held it valid, as a nuncupative will under private signature, where no dictation is essential.

In a number of cases at common law, suggesting or prompting a will at the time of making it, has been in a number of instances held to be a cause of nullity. 2 J. J. Mart. Ky. 331 ; 42 Barb. N. Y. 274 ; 5 Gill &. J. Md. 269 ; 17 Barb. N. Y. 236 ; 2 Bradf. N. Y. 133 ; 1 Redf. N. Y. 220.

. What may have occurred on the day previous to that on which the will was drawn up, or subsequently, can be of no assistance to supply fatal omissions at the time of the making of the testament. The formalities required by law for the confection of an authentic will are specially detailed by law and must be fulfilled at one time and without diversion to other acts. If the formalities are not then and there fulfilled, the will is a nullity and cannot be executed. They cannot be supplemented by occurrences previously or subsequently taking place. The validity of the will depends upon the fulfilment of legal exigencies at the making thereof.

To declare judicially that the will of Edward Burke was *dictated*, as the law requires, would be to write out of the Code the wise provision on the subject, and expunge the wholesome adjudications from the French and our own jurisprudence, by which, without a solitary dissenting voice, all courts have invariably required that the dictation should be the spontaneous offspring and untrammelled expression of the testator's volition.

It has been held by this Court that testaments are more easily avoided than contracts, on the ground of unsoundness of mind, but that a will may be made during a lucid interval by a person mentally afflicted. R. C. C. 1788 ; 6 An. 108 ; 1 B. Monroe, 263. That " lucid " has been said, by this Court, to be: not an apparent tranquillity or seeming repose, not a simple diminution or remission of the disease, but a temporary cure, an intermission so clearly marked that it perfectly resembles a return of health, and must have continued for a length of time sufficient to give certainty to the temporary restoration to reason. Aubert vs. Aubert, 6 An. 124 ; V. Dig. de acq. vel amitt. poss. 1, 18, § 1, and furiosum Cod. qui test. fac. pos. 1, 9 ; Dig. de Jud. L. 39 ; Dumoulin, Qui test. fac. pos.

Without going to the same length, we can safely say that the will in this case was not made in a lucid interval.

We have not thought necessary to expound the rules which alienists have seemingly established as tests of the mental condition of persons apparently affected with intellectual derangement, in order to determine whether such persons are or not afflicted with incapacitating or disabling insanity. Neither did we think it useful to show, by medical authorities, that, between insanity and idiocy, unsoundness of mind, which does not amount to complete insanity, or imbecility, finds a proper place as constituting partial mental incapacity or disability.

In relation to epilepsy, a writer of marked distinction, whose authority the defense does not dispute but admits, Dr. Affleck, in the 9th Ed. Encyc. Brit. says: that in not few cases there is a steady mental decline which ends in dementia or idiocy, and that the later in life the disease shows itself, the more likely is the mind to suffer.

Also, Ray on Insanity, 52, 123, 360, 416, 461, *et seq.*; Jarman on Wills, Vol. 1, pp. 72, 360; 32 An. 1055.

The fitness of that doctrine to the present case is apparent.

All the circumstances surrounding and attending the drawing up of the instrument termed the last will of Edward Burke being considered, we are of opinion that it is established that the testator did not possess a mind capable of exercising judgment, reason and deliberation, intelligence capable of weighing the consequences of his will and its effects to a reasonable degree upon his estate and his family. We, therefore, conclude, that he was at the time of unsound mind and mentally incapacitated, and that the act, which is fatally defective in its confection, not being the repositary of his last intentions, cannot receive execution. 27 Iowa, 110; 19 Mich. 482.

We think proper to say, that although we might, we do not rest this opinion on the defect of form in preparing the instrument.

We think there is error in the conclusions of the District Court.

It is, therefore, ordered and decreed, that the judgment appealed from be annulled, avoided and reversed, and proceeding to render such judgment as should have been rendered: it is ordered, adjudged and decreed, that there be judgment in favor of plaintiff and against defendants, and accordingly, that the authentic act executed in this City on the third of June, eighteen hundred and eighty, more fully described in the petition herein, and purporting to be the nuncupative last will and testament, by public act, of Edward Burke, be, and the same is hereby declared to be null and of no effect, and that the dispositions therein contained shall not be executed. It is further ordered, that the defendants pay costs in both Courts.

Poché, J., concurs in the decree, for reasons in his separate opinion.

## CONCURRING OPINION.

POCHÉ, J. As the testimony fails, in my opinion, to prove in the testator such unsoundness of mind as to incapacitate him from making a valid will, I rest my concurrence in the decree rendered in this case exclusively on the ground that the will was not dictated by the testator himself as the act of his own mind and volition, but that it was prompted to him, word for word, by another person, after whom the testator repeated or uttered the words which were written down by the notary.

On this point, and on the right of plaintiff to avail herself of this defect, although not specifically alleged in her petition, on the ground that the door to this inquiry was opened by the defendant himself, I concur with the reasoning of the Chief Justice as the organ of the Court.

## DISSENTING OPINION.

FENNER, J. In my view, the only questions presented for our solution under the pleadings in this case are:

1. Whether the testator, Edward Burke, " was of insane mind and mentally incapacitated to make a will " on the date of the will attacked.

2. Whether the will is invalidated by reason of having been made under the undue influence, suggestion or captation of Augustin Burke.

These are the only grounds of nullity raised or even suggested by the pleadings, and the last mentioned even of these is so vaguely charged as to render it doubtful whether it should be considered.

### I.

In the case of Kingsbury vs. Whitaker, 32 An. 1055, we had occasion with unusual care to consider and expound the important principles underlying the freedom of testamentary disposition, the habitual reluctance of courts to interfere with it, and the kind and degree of mental capacity required for the valid exercise thereof.

We there held, with the support of abundant and high authorities, that notwithstanding a certain impairment of mental health, activity and vigor, as the result of old age or disease, and notwithstanding the exhibition of curious eccentricities of thought and action, yet if the individual retains sufficient of the reproductive faculty to collect in his mind the particulars of the business in hand, to understand the nature of the testamentary act, to appreciate its effects, to know what property he has to dispose of, the claims that are upon him and their relative importance, and to form a rational desire that his property should be disposed of in a certain manner, then he is, according to law, capable of exercising the privilege of disposing of his own property.

The evidence in this case, taken as a whole, leaves upon my mind the perfect conviction that the testator, Edward Burke, possessed all necessary mental capacity for the making of a will.

He had been an active and intelligent business man, had accumulated a large fortune and had reached the age of 75 or 80 years, when several months before his death he became subject to epilepsy, which severely prostrated his physical health, and no doubt in some degree affected his mental condition, as is commonly or frequently the case with that disease.

The evidence of the extent to which his mental integrity was affected is so conflicting, that it is impossible to reconcile it upon any theory of even intended truthfulness. If we are to believe the only important witnesses of plaintiff, he was, for six months before the will, an utter helpless imbecile, incapable of reading or writing, of attending to any business, of counting money, of being trusted alone, of doing any rational act whatever.

The very extravagance of this testimony operates its own destruction. It is overwhelmingly contradicted by the evidence of numerous witnesses of the highest character, as well as by various independent facts which are incontestably proved.

His physician, who attended him constantly during this period, a gentleman of the highest personal and professional reputation, testifies that his mind remained entirely unimpaired with the exception of a slight defectiveness of memory.

His lawyer, one of the most eminent practitioners at this bar, who had frequent consultations with him on business matters during this time and who advised and assisted him in the making of the will attacked, declares he was then and at all times in perfect possession of his mental faculties.

His priest, who frequently administered confession to him and held other interviews with him during his latter days, affirms his perfect sanity and intelligence.

Their testimony is confirmed by that of numerous other witnesses of character and standing. It is, besides, affirmatively shown that he continued to discharge his own important bank business, that he made his own deposits and drew his own checks. The checks are produced in his own handwriting and signed by himself. The deposit lists are shown filled up by himself, and entirely correct as to items and additions. He drew dividends on his bank stock and had interviews with the president and other officers of the bank, exhibiting, according to their statements, no sign of mental incapacity.

He was in the habit of getting his own medical prescriptions filled,

and the druggist, who had frequent conversations with him on such occasions, found nothing to awaken suspicion of his sanity.

A letter written to his brother a few weeks prior to the will is produced, entirely coherent and intelligent.

Manifestly, as before stated, these opposing lines of testimony are not reconcilable.

The Judge of the District Court, a magistrate of great ability and long experience, who saw and heard all the witnesses, maintained the will.

There is nothing to show that the will was not conformable to the tenor of his affections. The only person who complains, or has a right to complain of it, is his daughter, the plaintiff. But he had made a prior will, six months before the present one, and at a time when there is surely no proof that he was incapable, and he then left her nothing. She was a child by first marriage, who had always lived away from him, and whom he had seen but once since she was three years old, although her age, at the date of the will, was about fifty years.

On the other hand, the present universal legatee was his youngest and only surviving brother, for whom he entertained a lively affection, and who, though living in Great Britain, had for a number of years been in the habit of coming to this country yearly to visit him.

## II.

I can find in the record no evidence whatever of any influence used by Augustin Burke, in reference to the will.

His presence in this country was in obedience to the express request of his brother.

The evidence of the attorney who prepared the sketch of the will is positive that it was drawn under the exclusive direction of the testator, and that Augustin Burke took no part therein.

The evidence of the notary and witnesses who attended the confection of the will is positive that Augustin Burke never spoke or made any suggestion whatever of any kind, while it was being done, or before or afterward.

The charge is wholly unsupported by any evidence whatever.

I pretermit all consideration of the question whether, under C. C. Art. 1492, such evidence would have been admissible.

## III.

I can find no possible foundation in the pleadings for raising any question as to the validity of the will on the ground of defective execution.

If Augustin Burke had aided in the dictation of the will, perhaps,

23

under the allegation of plaintiff's petition, that it was made under his influence, that question might have been raised. But it is shown that, neither directly nor indirectly, did he have anything to do with it.

I think this should shut out all consideration of that question. Nor did defendants enlarge the issue by proving the circumstances attending the confection of the will. Those facts were germane to the question as to whether it was made under Augustin's influence, and were properly shown to establish his innocence of that charge.

Nor do I find anything in those circumstances reflecting on the capacity of Edward Burke. The notary and other witnesses establish that it is a common practice for persons making wills to have their desires put in writing beforehand, under competent advice, and then to dictate from such writing. Indeed, I see not how, otherwise, ignorant persons or persons even of moderate intelligence could properly dictate a will. The fact that, in this case, the testator dictated from the reading of a memorandum so prepared, by one of the witnesses, does not affect the question of capacity. The will is shown to have conformed to the memorandum. The latter is shown to have been prepared under his personal and intelligent direction. The will was read over to him after it was taken down by the notary and before he signed it.

I think the judgment appealed from should be affirmed, and therefore dissent.

---

### ON REHEARING.

The opinion of the Court was delivered by

MANNING, J. The will of Edward Burke was declared null by this Court on the first hearing because of the testator's unsound mind, and consequent incapacity to make a testament. As I was not a member of the Court at that time, I may be permitted to speak in my own person, in expressing the convictions forced upon my mind by the examination of the testimony.

Only two grounds of nullity are alleged by the plaintiff: 1, mental incapacity of the testator; 2, because the will was made through the instrumentality of his brother.

No issue of the defective execution of the will is made in the pleadings, although all the facts touching it have been elicited in the testimony, and there was discussion at the bar on the right to consider that question, upon bills of exception, as well as difference of opinion on the bench both on that point, and the effect of the evidence when considered.

Pretermitting the settlement of the controversy whether that matter is rightly before us, I think the requirements of the Code were com-

plied with. Landry vs. Tomatis, 32 Ann. 113. The object of the law is to assure that the testator's dispositions shall be embodied correctly in his testament. They were given by himself to his trusted legal adviser, who put them in form, and at the moment of making the will the testator repeated the words which were read to him from this memorandum by one of the witnesses, and the notary wrote them as they fell from the testator's lips. There is no suggestion that the will is not in conformity to the memorandum. There can be no dispute that the will contains his testamentary dispositions, if the memorandum is a faithful expression of them, and there is unquestioned proof that he gave the instructions to his lawyer himself, with deliberation and with much pains-taking. Hathorn vs. King, 8 Mass. 371.

Reading the testimony in this bulky record on the insanity of the testator, the attention is arrested by the fact that all the witnesses of intelligence and good judgment are on one side, and those of ignorance and passion on the other. Divesting the mind as much as possible of the influence which such discovery naturally exerts, we probe the motives of the conflicting witnesses—motives deduced from their surroundings, and the relations they bear to the persons whose interests are to be affected by their testimony. Scrutinizing yet more closely, we observe the manner of testifying, for as the language of the witnesses is given as uttered on the stand, and thus a mental photograph is obtained, we can construct a representation of the physical scene. The impression produced by the discovery just noted is thus intensified, and we are prepared to hear extravagant and peremptory assertions of the mental condition of the subject on the one hand, and cautious and reserved opinions on the other.

The widow of the testator swears that her husband "was never in his right mind from the first fit he had," which she says was March 22, 1879, fifteen months before his death, and at the close of a long examination, when asked by the plaintiff's counsel, from all she had known of him, his conversations with her and his acts, what impression was made upon her as to his sanity, answered : "he was as crazy as any one could be." Yet when informed after her husband's burial of the will in favor of his brother, and then stigmatizing the deceased as an ungenerous man, she never intimated or asserted that he had been crazy. Her complaint that she was not consulted is an admission that her husband was sane enough to consult. It is incredible that she had believed him never in his right mind for the last year of his life, and not have given expression to that belief at the critical moment when informed of an act of his, intensely offensive to her, and peculiarly provocative of observations touching his insanity, if it existed. Evidently her thought was that she alone was the injured party.

It was the earnings of her industry she was deprived of. The image of the neglected daughter, unmentioned in both wills, was faint and dim then, far away in the background. Her *entourage* gave a faithful reflex of her own feelings. The language of the maids and men around her conforms to her own. Mary Doyle, without hesitation or qualification, pronounces Edward Burke " perfectly insane," and Kate O'Meagher declares " his mind was gone entirely."

Yet this man had been in almost daily intercourse with persons of intelligence and observation during the whole period of this patent insanity, and not·one of them had discovered it. He had attended to business—not indeed to the menial work of the shop, such as waiting on customers, for which he had shopmen, and might well refrain from it at his advanced age—but to the management of his affairs on a large scale, to looking after the repair of his houses, and giving bond at the Custom House to the Government in the course of his business—to the collection of his revenues, and the investment of his surplus. On April 22d he wrote a letter to his brother and sister, a model of expression of manly affection with domestic allusions interspersed. On June 8th, the day before his suicide, he was inquiring about the approaching dividends on his bank stock. During the five preceding months, to go back no further, he is shewn to have deposited his money in bank, to have drawn checks, pursued his debtors, in short, to have done everything that was needful to do, to have been always *au courant* with his business, and personally to have attended to its details. During this time he was in frequent consultation with his lawyer, asking advice upon current business, and talking of the will he intended to make—with his doctor, who was watching his ailments and prescribing for them—with his priest, whose function was to look after his soul's welfare—with his banker, whose judgment on matters of finance controlled his own—with a considerable number of respectable and disinterested men besides, all of whom unite in pronouncing him of sound and disposing mind. During the first week of June, before that fateful day when his inscrutable self-destruction was accomplished, he is shewn to have conversed and transacted business with fourteen different persons, among whom are two lawyers, two doctors, a druggist, a notary, two old friends and neighbors, a brother, two nieces, a tenant, nine of whom are without interest or bias, and there is not a break in the chain of testimony, nor a halt in its progress to the establishment of his possession of his faculties to the extent necessary for the exercise of testamentary power.

Certainly there was mental lesion, occasional and temporary intermission of memory, and sometimes aberration, but the books scarcely shew a will case where contest was because of insanity, in which there

are so few unaccountable or unaccounted acts of dementia as in this. The curious in this branch of legal literature will find confirmation of this assertion in Redfield's American Cases of Wills.

By way of illustration, take the incident of chalking and cutting his shoes.

Mr. Burke is described by the witnesses as being a man of fine presence, of unusual dignity of bearing, manners of quiet repose, very neat and even fastidious in his dress. His feet hurt him. He called for lighted candles one evening, and a piece of chalk. Putting the candles on the floor and standing up, he made one of the women of the house chalk his shoes where he wished to cut them, and seating himself, cut the uppers and transformed them into low quarter shoes. Then his white socks became visible, and this offended his taste. He sent his wife out the next day to buy black silk socks. It will be a cause for alarm if a *penchant* for that article of dress shall be judicially pronounced a badge of insanity. His wife could not find any, and then the tidy old gentleman had black alpaca sewed over his socks to conceal the glare of their whiteness. The incident is at once tender and delightful, and warms one's heart to the punctilious old man.

The disposition of his property is invoked as proof of his incapacity, as well as of the undue influence of his brother. I think I can trace the evolution of thought which culminated in his determination to make the will exactly as it was done.

Mr. Burke was born and lived to full manhood in a country whose laws left the power to dispose of property untrammeled, save the provision of dower. There can be no doubt that laws mould individual and national character. They exert their influence silently and to the individual unconsciously, but the spirit of independence, of self-reliance, of robust manhood, which is engendered by freedom from restraint in matters that impair a man's rightful authority, and repress his individualism, impress upon him a sturdy and very noble character. Such men feel that the State governs best when it governs least, and that no infringement of individual action by the State is justifiable except when the general good imperatively demands it.

. Mr. Burke could with difficulty have conceived of a law that would seriously hamper his power to do with his property as he pleased. Only those who imbibed the same ideas of that right that he did, and in the same unconscious way, can realize the consternation with which he heard from his lawyer that one-half of his property was not his, and one-third of the other half would, on his death *eo instanti* belong to some one else. The severity of the blow was not mitigated by disguising this latrocinial wresting from him of the mastery over his property under the euphemisms, " community of acquets," and " forced heirship." He felt

that a law which had for its incentive a distrust of a man's natural affections was an insult to him—that a law which curbed his power as head of the family and abraded his authority was an invasion of his personal rights. He did not probably go any further and concern himself with its baleful influence upon the social state. The knowledge thus imparted evoked in him a spirit of revolt.

He had yielded to the influence of his love for his wife, as most men would and all men should, without any law, and had made a will giving her everything except a few legacies, but when he learned from his lawyer that she actually owned, or would own one-half of his property, he dying without debts as he knew he should, he hurried to destroy the will. He was not ready to make another, but he would lose no time in cancelling that one. He did it three days after it was made.

Several months passed, during which he no doubt brooded over this arbitrary denudition of his property, and often told his lawyer he should make another will. I have not a doubt that the disposition ultimately made was already determined on, and starting from the discovery of the law's interference with testators as an initial point, he surveyed the group of relatives who had the most claim upon him.

We have seen what he did when left to the spontaneous suggestions of his marital love. He had unfortunately been estranged from his daughter. She lived in New Jersey, not far away nor difficult of access, but he had never gone there to see her. He was separated from her in her infancy, and with the exception of a visit from her to him in 1854, had not seen her in forty-four years. Her marriage had displeased him. Her husband was repulsive to him. She was so completely outside the orbit of his life that his nearest friends did not know he had a daughter. His lawyer learned it with surprise when conversing about making a will. The gossiping barber, who had shaved him for twenty years, did not know it until after his death.

Of the $100,000 that he knew was the value of his estate, two-thirds or nearly seventy thousand was beyond his control. Approaching four score years, he revolved in his mind what he should do with the pittance that was his, in the full and satisfying sense of complete ownership. His thoughts reverted to the old country, and the kindred that were there. Old age habitually recurs to the incidents of early life, which are often more vividly present to them than the events of the passing day. He was transported in mental vision to the scenes of his youth. No ancestral home had been his. The hired cottage with its meagre appointments was the only roof-tree his youth and early manhood had known. The youngest of his tribe—the Benjamin of his family—was still alive. "His heart did yearn upon his brother," as did Joseph, and he straightway sent for him.

Godden vs. Executors of Burke.

Upon this brother had devolved the support of their aged parents and a widowed sister. Every winter for several years he had spent here. Taken ill here in 1876, that brother had made a disposition of property in favor of the testator, not forgetting to charge him with the support of their sister. The parents had long been dead. What more natural than that now, the testator should make his will in favor of that brother, putting on him in turn the charge of their sister, and providing for his two nieces here who had been always dutiful to him, and who had soothed his sensibilities when the acerbities (to use his expression) of " the old lady had made it too warm " for them and for him.

That is the will he did make, which we are now asked to annul.

It must be observed too that the younger brother had also acquired by his own efforts what to him was a fortune, $70,000. In his own language he "had made his conquest." He had taken care of his own. He would take care of what should be given him. There is no estimating too strongly this passion that dominates a man, who through a life of struggle and frugality has gained wealth, to wish it preserved and held together. We are apt to imagine he must have thought of the fact that his legatee was no longer young, and could not hold it together long. He did not look beyond the immediate effect of his bequest.

The acts that are relied on to establish his want of testamentary capacity are, some of them the vagaries of an aged man, others the effects of epileptic attacks that sapped his vigorous health. In view of the testimony of those who could intelligently estimate his mental condition, it is not a violent assumption that feminine imagination, and proneness of the ignorant to indulge in extravagant phrases, has exaggerated these acts into undue proportions.

Testamentary freedom is too valuable and important in every aspect to be restricted without the most stringent reasons. Testamentary capacity has been defined to be the ability to comprehend the conditions of one's property, and his relations to those who may naturally expect to become the objects of his bounty, Van Guysling vs. Van Kuron, 35 N. Y. 70, and this is what Lord Coke means by a " disposing memory." This Court in Kingsbury vs. Whitaker, 32 Ann. 1055, determined with care and circumspection the kind and measure of capacity required for making a will, fortifying its ruling by the decisions of numerous courts, and by the writings of alienists of accepted authority. It would add nothing to their force to repeat them, and they are too full to require to be supplemented.

We have closed our study of this interesting case with the conviction

that the will of Edward Burke ought to be maintained, and there remains only the duty of giving effect to that conviction.

Therefore, it is ordered and adjudged that our former decree rendered herein is set aside, and that the judgment of the lower court be, and it is hereby affirmed.

Bermudez, C. J., and Poché, J., dissent.

POCHÉ, J. I adhere to my original opinion.

### CONCURRING OPINION.

FENNER, J. While fully concurring in the decree herein and in the substantial reasons therefor, set forth in the opinion just read, which accord with my original dissenting opinion, I feel it incumbent on myself to state that the comments upon the system of the legal community and forced heirship prevailing in this State do not command my approval or concurrence.

Mr. Justice Todd concurs in this view.

### DISSENTING OPINION.

BERMUDEZ, C. J. I adhere to the original opinion delivered in the case. The facts then considered as justifying the charge of unsoundness of mind and mental incapacity in Edward Burke, disqualifying him from making valid testamentary dispositions during the existence of the debility, have not since changed. Stubborn in their essence and nature, they are to-day what they were at the time. A re-examination of the evidence, under the light thrown upon it by the extended oral argument on the rehearing, has confirmed me in the correctness of the previous conclusions to which the Court had arrived.

The best proof that Edward Burke was mentally unable to make a valid last will is, that he acted on the occasion the part of an automaton, repeating each and every word as the same was prompted and dictated to him by one of the attending witnesses, a scribe in the notary's office, whom he had never before conversed with, or even seen.

In the determination of questions of unsoundness of mind, those witnesses are most to be believed who are disinterested, who testify to facts and who had the best opportunities of knowing, however humble their walks in life may be. In such cases, assumptions should be rejected and facts adopted.

However great the respect be which should be paid to the legitimate and lawfully expressed last intentions of the departed one, courts of

justice should not lend their aid to the execution of such intentions, when it is apparent that they are the result of an undue pressure of an epileptic and superannuated maniac, whose mental condition and disability are firmly believed in, and loudly announced, by all near and around him, and it is evident that he has uttered such intentions in derogation of the course of nature and law, acting as a mere talking machine.

I, therefore, dissent.