(52 South. 160.)

No. 17,669.

### Succession of SCHMIDT.

(March 28, 1910. Rehearing Denied April 25, 1910.)

*(Syllabus by the Court.)*

WILLS (§ 55*) — MENTAL INCAPACITY — EVIDENCE.

Proof that within a period varying from 5 to 10 months after the making of a will the testatrix exhibited signs of senile dementia, and that, at the end of, say, 17 months, she was sent, under interdiction, to an insane asylum, is insufficient to support an attack upon the validity of the will, as having been made by a person mentally incapable, where the proof fails to show that the testatrix was insane before, or at the time of, the execution of such will, and where there is nothing in the will itself sounding in folly.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–161; Dec. Dig. § 55.*]

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

In the Matter of the Succession of Charlotte Schmidt. Rushian Johnson and others, proponents of a certain will, appeal from an order probating a will in nuncupative form. Reversed.

Dart, Kernan & Dart, for appellants. Woodville & Woodville, for appellees.

### Statement of the Case.

MONROE, J. The decedent died on May 17, 1906, leaving a nuncupative will by public act of date May 10, 1887, whereby she left three-fourths of her estate to the German Protestant Home for the Aged and Infirm, and the remainder to the Missionary and Educational Association of the Southern German Conference of the Methodist Episcopal Church, constituting those institutions her universal legatees, which will was ordered to be registered and executed and the legatees sent into possession. Some two months later, Elizabeth and Mary Hartwell presented a petition to the court, with another will executed by the decedent, by public act of date February 25, 1902, whereby she bequeathed all of her property to the petitioners, share and share alike, and they prayed that the probate of the will previously presented be annulled, that the will presented by them be recognized as valid, and that they be put in possession of the estate of the testatrix as her universal legatees. To the petition so filed, the German Protestant Home, etc., and the Missionary and Educational Association, etc., after filing certain exceptions, which were overruled, answered that the instrument, purporting to be the last will of the decedent, presented by the petitioners, has not that character, for the reason that the decedent was of unsound mind, and incapable of making a will at the time that it was executed. At a later date, Elizabeth Hartwell died, and Rushian Johnson, her testamentary executor, was made a party plaintiff, in her stead.

It appears from the evidence that the husband of the decedent died in July, 1886,

leaving her without relatives, so far as is known, and also leaving her the owner of some small houses about Eighth and. Chestnut streets, in one of which, on the corner of those streets, she lived. The houses, we imagine, were not particularly desirable, and, whether for that reason, or because she found it more profitable and the tenants less exacting, she fell into the way of renting them, by the room, as we infer, to negroes, and before very long, though just when the evidence does not show, she took two elderly negro women—sisters—into her own residence, the one, Elizabeth Hartwell, being a nurse, who at times worked out in the service of private families, and the other, Mary, who did the cooking and housework, and waited on Mrs. Schmidt, the latter, as we understand, getting their services for their board and lodging.

Dr. H. S. Cockram, called as a witness on behalf of the proponents, testifies, in effect, as follows: That he was graduated from the Tulane Medical College in 1891; that he lived, diagonally, across the street from, and knew the decedent, and attended her professionally from that time until 1902, when he left here and was gone about 18 months, during which interval (in August, 1903), she was interdicted and removed to an asylum, and he saw her no more; that, when he last saw her, say, in February, 1902, her mental condition was about what he had known it to be during all of his acquaintance with her.

"Q. Was she simply foolish, or have good sense, or what was her condition? A. I would say that she was a woman of moderate intelligence. Q. She had sense enough to know what she was doing? A. I judge so. Q. Would she, in your opinion as a physician, have sense enough to make a will disposing of her estate? A. I think, at that time, yes. That she was in as good a mental condition as any time that I knew her. Q. What was her condition, physically? A. She was always a frail woman; always. Q. Who was she staying with at the time? A. In her own property, which was being taken care of by two women, doing cooking and housework. Q. Do you know their names?

A. Two colored women, Lizzie and Mary, I think; Hartwell, but I don't know that. I know it was Lizzie and Mary. They used to work for me.· * * * Q. What was their treatment of her? A. Why, usually kind."

The witness, who disclaimed being an expert alienist, was then subjected to some cross-examination upon the subject of senile dementia, and a hypothetical case was stated with respect to which he said that a person in the condition stated would, in his opinion, be absolutely irresponsible. He was then again examined in chief as follows:

"Q. Did you observe any such condition in Mrs. Schmidt when you last saw her? A. Not when I last saw her. Q. And that was in the latter part of 1901, or— A. I am inclined to believe that it was in February, 1902; that is my impression" (for which he, elsewhere, gives a reason). "Q. And, at that time, she showed no signs of senile dementia? A. She showed no signs—she was an old woman. For 10 years I had known her condition—a woman of average intelligence—and I had been to her home innumerable times and she lived just across the street from me, and those two women took excellent care of her up to that time. Q. You have treated her, personally, during that length of time? A. Ten or 12 years; 10 years to the time I left."

Recross:

"Q. Who would call you in to treat her? A. She would herself. Q. Whom would she send? A. Numbers of times, she generally sent some one of those tenants, there; they had two servants at work there. Q. One of these colored women would come for you? A. Generally, those two that attended her; and the servant that worked at my house attended her; and a number of times—she lived diagonally across the street from me—and most of the time, as I walked out, the old lady would call me from the upper gallery. Many times, she would be at the gate, or in the yard, and called me. Q. You say you treated her since 1891? A. The first time I treated her was in the summer of 1891. Q. How old a woman was she when she died? A. I should judge she was—she looked like a woman about 65—I don't know what her age was at all."

Henry Schomacker and his sister, Theresa, had known the decedent for many years; they lived on the next corner; she visited their mother; they saw her, at intervals, at her (their mother's) house, also in passing, and on the street, etc. Henry Schomacker

says (speaking of the period almost up to the time of her interdiction):

"She always had her good sense whenever I saw her. She was a woman—a kind of a woman this way—very sassy. You never could have any conversation with her. She would cut you short, and give you a bad word, perhaps."

Theresa Schomacker, being asked:

"From your general association with her during those last three years" (referring to the years preceding her interdiction) "did she give you the impression of being crazy?"

To which she replied:

"No, sir; no sign of crazy."

Mrs. Sophie Schomacker, the wife of Henry Schomacker, says that the decedent talked intelligently (though not to the witness, who rather avoided her, because, in answer to a question, on one occasion, the old woman had replied: "None of your business; mind your business."). The witness being asked:

"And up to the time that they took her to the retreat, so far as you know, she was perfectly sane and all right?"

To which she replied:

"Well, I never saw her, since the time she went over the river, and I know that she had her own senses then—only childish. I thought she was childish and forgetful, like when you get old. I didn't see anything like being crazy, because she knew everybody."

Frank Heim, an old German carpenter who had known the decedent, and had worked for her off and on for a good many years, did not think she was crazy, and testifies that nobody said so; in other words, she was not so considered by those who knew her. Elizabeth Hartwell (who died after she had testified) says:

"Mrs. Schmidt, to me, was like her brain was weakened down, she loved to walk; she would walk to Louisiana avenue, if you would let her, but Dr. Loeber said she might go on the car track, and her mind might leave her. * * * Q. That was in 1903? A. Yes, sir. Q. How was she in 1902? A. All right, she rang for me one time; she wanted to see me, and I went, and she told me: 'I wanted to make my will.' She said: 'I wanted to do it for a long time.' Q. Did you know her in February, 1902? A. Yes, sir. Q. What was her condition then? A. At that time, I was home with rheumatism. Q. Was she reasonably rational? A. No, sir; always nice (?). Q. Did she know what she was doing? A. Yes, sir; and I went to market with her—she would select what she wanted."

The witness also testifies that, at the request of the decedent, she went with her to the notary's office, when the (now disputed) will was executed. Mr. Jeff C. Wenck, the notary by whom the will was executed, remembers the circumstance quite well, and says that the decedent talked reasonably, and appeared to know what she was doing; that he had interviewed her on several occasions upon the same subject before, and she always persisted in doing the same thing. She said they (the two legatees named in the will) had taken care of her and were attending to her entirely, and they promised, the witness believes, to take care of her the balance of her life. She said they were the only friends she had on earth; she had no other friends. W. W. Girault testifies that he witnessed the will, and that the decedent seemed quiet and natural and to know what she was doing; that she told Mr. Wenck what she wanted. Mr. Wenck put it down, and read it to them all, and she said that was her will, and that he witnessed it, and went off. W. A. Wenck identified his signature as a witness, but had no particular recollection of the circumstances, having witnessed a great many wills at the request of his brother, the notary. Rushian Johnson, nephew of the proponents, was also a witness to the will, and testifies that he went with the decedent to the notary's office, and that she told the notary that:

"There was two old people that had been with her in all her sickness—been with her since her husband died—and she was alone, and they cared for her all the time, and, in case she died, she wanted to leave them something, because she had no relatives at all."

That, after the will was made, she told Mr. Wenck that she was perfectly satisfied, and

paid him for his services. On behalf of the opponents, were three witnesses called, who testified, in effect, as follows: Dr. F. Loeber was graduated in medicine in 1899. Sometime in 1903, he was called, he does not remember how or by whom, to visit the decedent, and found her suffering from weakness and exhaustion.

"I found" (he says) "that she was exhausted from want of nourishment, but it afterwards proved to be senile dementia. Q. What was, then, the condition of her mind—the state of her mind? A. She was crazy. * * * I found the woman in an exhausted condition, as I told you, and that she was not of sound mind. I would ask her a question, and she would just 'Tat, tat, tat, tat'; that was all you could get out of her. She would just chatter. * * * Q. Had you any experience in insanity or dementia at that time? A. Yes, sir; that is why I state I couldn't determine, first, whether it was starvation or other causes. I found out, afterwards, that it was senile dementia. First, it presented a case to me, when I looked at it, like the person was starving, and I afterwards found out it was'nt starvation, it was senile dementia. * * * Q. How long did you go there? A. I was there, regularly, in attendance for a month—every day. Q. That was about a month before this petition for interdiction was filed? A. Yes, sir."

The doctor further testified that it was at his instance that the petition for interdiction was filed, and that he was one of the physicians upon whose report the interdiction was decreed. He does not profess to be an alienist, and gave no testimony with regard to the probable time during which his patient had been in the condition in which he found her. Mr. Seither is vice president and chairman of the house committee of the German Protestant Home (one of the legatees under the first will), and has been connected with the institution for many years. He knew the husband of the decedent and was on friendly terms with him. After the death of the husband, however, he disapproved, as we infer, of the decedent's manner of life, and, for a number of years prior to her death, saw but little of her. He says that, about four years before she was sent to the asylum—

"one of the colored women would bring her over to the" (his) "house and say that they wanted to go out and couldn't leave her by herself, so they brought her over to the house, and she always caused my wife to lock the door, because she would try to get away. * * * Q. Do you know why they did that? A. I don't know. Of course, Mrs. Schmidt was in such a state that she would do anything, almost. You couldn't talk to her; she was altogether off."

He says that, happening to meet Mrs. Weber, on one occasion, whilst Dr. Loeber was attending Mrs. Schmidt, and being told by that lady that she was going to Mrs. Schmidt's he went with her; that, prior to that time, he had not called on Mrs. Schmidt for three or four years, though, before that, she was in the habit of coming to his house every Sunday, and going to church with them and taking dinner; that, during the (say) "four years preceding her interdiction, she did not come to his house, save when brought by one of the colored women"; that "they might have brought her over to the house four or five times" within that period; that he could get nothing intelligent from her on those occasions."

Mrs. Angeline Leininger testifies that she borrowed some money from the decedent, and in March, 1900, called on her to pay the interest; that Mrs. Schmidt—

"acted very queer; she didn't know nothing about the money; she didn't know I had any from her; and then, when I paid her the money, I had to get the colored woman—I gave her the money and she gave me my note back, and that was in 1890" (meaning 1900) "in March. * * * Q. How many times did you see Mrs. Schmidt after that? A. About twice I saw her, and, then, you know, she got so bad, you know. I didn't go to see her any more. She had a doctor attending to her, and I didn't get to see her any more."

Cross-examination:

"Q. How many times, after 1900, did you see Mrs. Schmidt? A. I seen her about three times. Q. How long after 1900? A. Well, that was a couple months after—about six months after. Q. And then, after that, did you see her? A. After that, I didn't see her no more, because I didn't go out of the house, because I was always at home. Q. And this money you state you paid her, you paid it to

one of the colored women? A. In six months, the note was due—that was the interest that I paid her, you know—in six months, the note was due, and I gave it to Mrs. Weber to give it to her and bring me my note. Mrs. Weber brought her the money, and gave me my note."

She says that she had been acquainted with Mrs. Schmidt for about one year prior to the visit when she went to pay the interest on the money that she had borrowed from her, and she proceeds:

"Six months before I paid her the interest, I went to see her, and she was all right. She was in good health and was all around. She took me all over the house, and was very friendly. * * * Q. And when she loaned you the money, she was all right? A. Yes, sir; and when I went to see her again, she was not all right when I saw her. That was in 1900. She didn't recognize me."

The witness further testifies that, after 1900, she saw the decedent on the street going to Mrs. Weber's; that she knew where she was going, and how she was going, but that she looked "queer"; that she had formerly worn nice clothing, but on the occasions referred to "looked careless and raggedy, you know; didn't looked like she knew what she had on."

Mrs. Henry Weber, at the time she testified, was 84 years old; she had known Mrs Schmidt since 1848. Being asked whether she visited the decedent during the last five or six years of her life, she replied:

"They used to call me—Mary, the colored girl, used to call me—when she would go around the house with a light in the house. * * * She used to go around the house looking for some one, like a man was in the house—scared, and I would talk to her, and she would go back to bed."

The witness said that matters went on in that way for about four years before the decedent was sent to the asylum; that she was sometimes called "twice in a week, and, sometimes, not once in a month; sometimes, often in a week." Her cross-examination proceeds, in part, as follows:

"Q. The night you say you found her with candles, looking for something? A. For a man in the house. Q. For a burglar? A. Yes, sir. Q. She was scared? A. Yes, sir. Q. You soon convinced her there was no burglar? A. Yes, sir; she wanted to talk to me. Q. She got quiet, though, didn't she? A. Yes, sir. Q. Did you stay all night with her, that night? A. No, sir; just as soon as she went to bed, I went home. * * * Q. How long had this old colored servant been up there? A. I couldn't tell you. Q. Can you give us an idea about how many years it was? A. About six or seven years before she was taken away. * * * Q. Did Mr. Seither take any care of Mrs. Schmidt during the last four or five years? A. No, sir. * * * Q. Did he ever bring her any delicacies or call at her house? A. No; I told him once to go there. He told me he would not go; that she mingled with negroes, and she should stay with negroes. Q. In other words, he did not want to have anything to do with her? A. Yes, sir. * * * I am the only one who went to see her; yes, sir. Q. In her last years? A. Why, no church ever looked after her, but for her money. Q. Did the same thing apply to Mr. Seither?" (Objection.) "By the witness: I have nothing to do with that; you only asked me about Charlotte's mind. Q. But this has a bearing on the case? A. Her church was no friend to her, to go to see her."

The witness further testifies that, for two or three years before Mrs. Schmidt was taken to the asylum, she could not—

"talk right; she lost her speech entirely, she could not understand what she wanted; * * * she got silly like; the first commencement was that she could not wash herself, or comb her hair any more, and, if you didn't force her, she would not put on clean clothes. In other words, she got childish in her old age. * * * She could not speak, and you could get nothing out of what she was doing. Q. That was two or three years before her death? A. Four years before her death." (Mem. Her death, it will be remembered, occurred on May 17, 1906.) "* * * She never was all right; that you could say she was all right. * * * Sometimes she would sit down and act quiet. * * * She could not tell me what she means and what she wants; so I could not make that out. I took her to be silly, like a person who sets down and don't know what they want. * * * I seen her in 1902; that was the worst time she had. They came in and got me that time. Q. In winter time that was? A. Winter and summer; she had not her right mind from 1899 on. Q. That is, her mind was weak, from that time on? A. Yes, sir; she could not speak good, and could not remember anything."

Speaking of the relation between the decedent and the Seither family, the witness says:

"She complained that she could not talk and they put her aside. * * * Q. Charlotte felt put out about it? A. Yes, sir. Q. What do you mean by that? A. That time she could talk yet. Q. About what year was that? A. I could not tell—it was so long and I am so old—it was about ten years ago."

At another time the witness testifies as follows:

"Q. Do you know whether Mrs. Schmidt ever left home? A. Yes, sir; she left home, if I am not mistaken, in 1891." (Mem. We find in the record the figures "1901" in pencil, above those given by the witness.) "She left home and went over the river. Q. Where was she brought when they found her? A. A colored man found her on Harvey's canal, and he took her and put her in jail, and the next morning they got her out. Q. Where was she brought? A. Right to my house, here. Mary, the old colored woman, had to come with her. Q. What was Mrs. Schmidt's condition, then? A. She could not talk; she could not tell where she was, nor what she was doing. She did not have a nickel to come over the ferry. Q. Did she have on any clothes? * * * A. Clothes she had on, but no shawl; it was cold."

Other witnesses fix the time of the excursion "over the river" as about three or four months prior to that at which the decedent was sent to the asylum, or, say, March, or April, 1903.

### Opinion.

The evidence leaves no doubt in our minds that the decedent was a proper subject for interdiction at the time that Dr. Loeber was called to see her, say, in June, or July, 1903, and that she was probably in that condition as early as, say, March, 1903, when she wandered across the river, and perhaps earlier, but we find it impossible, upon any theory upon which the testimony of the witnesses can be reconciled, or upon which they can be credited with the intention to testify truthfully, to concur in the conclusion reached by our learned brother of the district court, that she was in that condition, or was incapable, in February, 1902, of making the will here in contest. The testimony in question was taken, at different times, from May to December, 1908, more than six years after the date of the will in question, and was given by witnesses who, with one or two exceptions, had no particular reason for remembering whether the condition to which they testified existed in one year rather than another, and it was easy and natural that, under such circumstances, they should confuse the conditions and occurrences of one year with those of others—sometimes quite widely separated. Dr. Cockram was guided by certain data which enabled him to fix the period to which his testimony related without difficulty, and with such confidence as to render it extremely improbable that he could have been mistaken. Thus: He was graduated as a doctor of medicine in the spring of 1891; he was then living, and he thereafter lived, across the street from the decedent. He first began attending her, professionally, during the ensuing summer, and his attendance continued until the winter, or, as he thinks, sometime in February of 1902, when he decided to leave the city. He says, in answer to the question:

"How can you be so positive of the year, at this late date?"
"The only way, I was sick myself, and went off; that is the only way. I left the first of June, and the old lady had been sick a few months before—had had the grippe—and I was afraid she would have pneumonia. That is the only way I can state it—by leaving, myself, makes it absolutely positive."

And, up to that time—i. e., when he last saw her before his departure—the decedent, whom he had always known as a woman of "average intelligence," was in as good mental condition as any time during his acquaintance with her. His impression was that he had last seen her in February (the will here in contest having been made on the 25th of that month), but, conceding that it may have been in January, or about Christmas of 1901, his testimony is still the most satisfactory, with reference to the time, and the most authoritative with respect to the condition existing at that time, of any (if we leave out that given by the notary and the witnesses

to the will) that we find in the record. The testimony of the other witnesses, as to the condition of the decedent, within one, two, three, or four years of her interdiction, is general in character, and is supported by no data which would have been likely to fix in their memories the relation between the condition and the time, so that, in view of the fact that we have the testimony of a competent medical man, supported by such data, who during the period mentioned, and for some years prior thereto, had been a constant attendant upon the decedent, and had made her "innumerable visits," for the purpose of ascertaining and advising concerning the condition of her health, we feel justified in dismissing the testimony of the other witnesses, with the observation that if those called on behalf of the opponents testify that the decedent was incoherent and irresponsible at any time prior to February 25, 1902, those called on behalf of the proponents testify to the contrary.

Mrs. Weber, we infer (though the evidence to that effect is not direct), was the person at whose instance Dr. Loeber was called, and was therefore, in a measure, responsible for the interdiction, and she was naturally inclined to justify her interference. We have no reason to doubt that her action in the premises was inspired by the most humane motive, and was entirely proper in itself, but we are of opinion that, in giving her testimony, she has confused the different periods in the mental condition of the decedent, and has attributed to the latter, at a time when she was sane, the same mental incapacity which induced her to call in medical advice, for it is utterly impossible that the decedent being, as Mrs. Weber says she was in 1902, and for several years prior thereto, incapable of speaking, or understanding, etc., could have impressed her constant medical adviser with the idea that she was a woman of the average intelligence, or that she could on February 25, 1902, have dictated her will to the notary in the presence of witnesses. Mrs. Weber, it will be recalled, was 84 years of age, and, at one time, admitted that on account of her age she was unable to remember at what time it was that the decedent lost the power of speech. At another time, she stated that the decedent wandered "over the river" in 1891, and, though it may be that she meant to say 1901, the fact, as established by other testimony, seems to be that the wandering in question did not take place until within three or four months, or at most a year, of decedent's interdiction. It may be remarked in that connection that the episode referred to is almost entirely taken as established upon hearsay testimony, the nearest approach to direct testimony on the subject being that of Mrs. Weber, to the effect that the decedent was brought to her house by the old woman, Mary, who told her (Mrs. Weber) that she (Mrs. Schmidt) had wandered across the river, etc. We think, however, that the story may be accepted as true, and it appears to us that the incident may, perhaps, be regarded as indicating the approaching end of the decedent's mental life. We are still, however, confronted with the facts (as we estimate the evidence) that it is not proved that, prior to or at the time of the making of the will here in question, the deceased testatrix was affected with any mental disorder. Conceding that she was suffering from senile dementia in June or July, 1903, or, even at a period as far back as August, 1902, the evidence adduced does not authorize the conclusion that she was so incapacitated on the 25th of February, 1902. It can hardly be said that there is any authoritative information in the record upon the subject of senile dementia, since neither of the physicians who were examined professed to be expert alienists, and we are not disposed to exploit any original views upon that subject. We may remark, however, that we

imagine that senile degeneration (of the organs, vessels, and tissues of the body) precedes senile dementia, and that there may be a long interval of time between the beginning of senile degeneration and either the mental or physical death in which it may end. However that may be, our conclusion is that the opponents have failed to show that the testatrix was, either at any time before, or at the time of, the making of the will which they are contesting, incapable of making her will. The will itself contains nothing sounding in folly. The testatrix was a woman of the domestic servant class, from the continent of Europe, who came to this country when she was young, and who, by reason of her vocation, was probably thrown during the greater part of her life with negroes. In her old age, she was left alone, and, whether by reason of her own temperament or from other causes, became alienated from the people of her race and church, and confined her intercourse mainly to the two negro women whom she had taken into her house, and, who, from the uncontradicted testimony in the record, served and nursed her faithfully, until she was taken from them by the decree of the court. She told the notary that they were her only friends, and her statement is corroborated to the extent that no one else, save Mrs. Weber, has appeared in these proceedings pretending to the contrary. Whose fault it was we are unable to say. The fact remains. We do not find it surprising under such circumstances that she left her property as she did, and we think it ought to go as she intended.

It is therefore ordered, adjudged, and decreed that there be judgment in favor of the proponents, Rushian Johnson, testamentary executor of Elizabeth Hartwell, deceased, and of Mary Hartwell, and against the defendants the German Protestant Home for the Aged and Infirm and the Missionary and Educational Association of the Southern German Conference of the Methodist Episcopal Church, vacating and annulling the judgment heretofore rendered by the civil district court for the parish of Orleans, probating the instrument presented as the last will of Charlotte Schmidt, deceased, executed, in nuncupative form, by public act, before John Bendernagel, late notary, on May 10, 1887, and decreeing said instrument to be void and of no effect. It is further adjudged and decreed that the last will and testament of said Charlotte Schmidt, executed in nuncupative form before Jeff. C. Wenck, notary, on February 25, 1902, and herein presented by said proponents, be received, registered, and executed as the last will of said testatrix, and that the said proponents be recognized as the universal legatees of said testatrix and sent into possession of her estate, share and share alike, as provided in said will, and that the right be reserved to said proponents to take such other and further proceedings in the premises as justice and nature of the case may require. It is further decreed that said defendants pay all costs.