(77 South. 290)

No. 22709.

Succession of MILLER.

(Nov. 26, 1917. Rehearing Denied Jan. 3, 1918.)

*(Syllabus by the Court.)*

1. WILLS ⬯55(1)—TESTAMENTARY CAPACITY —WEIGHTS OF EVIDENCE.

The testimony of the attending physician of the deceased, her minister, her nurses, her bankers, of lawyers and notaries, of merchants with whom she did business, of friends, acquaintances, and relatives to the effect that the deceased was of sound mind, and not insane, outweighs the testimony of other persons who testify to certain acts of the deceased which they claim shows that she was of unsound mind.

2. WILLS ⬯55(11)—TESTAMENTARY CAPACITY —SANITY—EVIDENCE.

The fact that a person who received $187,000 by inheritance in 1901, that she gave her personal attention to the management of her affairs, and that this fortune had increased about $41,000 in 16 years, is strong evidence of the sanity of such person.

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

In the succession of Caroline Amelia Miller, deceased, with petition by Mrs. Caroline Rein Baumann attacking the will, opposed by Frank Brinker, testamentary executor, and Mrs. Frank Brinker, residuary legatee. Judgment decreeing the will to be valid, and contestant appeals. Affirmed.

James Barkley Rosser, Jr., of New Orleans, for appellant Baumann. Raymond Gauche, of New Orleans, for appellees Frank Brinker and Mrs. Frank Brinker.

SOMMERVILLE, J. Miss Caroline Amelia Miller, a feme sole, aged 54 years, died at her domicile in New Orleans, May 30, 1916, leaving a last will and testament in nuncupative form by public act.

Mrs. Caroline Rein Baumann, assisted by her husband, alleged that she was a first cousin of the deceased, and that together with two other cousins they were entitled to receive the whole of the estate. She attacked the validity of the will on the ground that Miss Miller was insane and without testamentary capacity; that she did not dictate the will to the notary and the witnesses named therein; that it was not written in her presence and in the presence of the witnesses; that it was not read to the testatrix and the witnesses; that it was not signed by the testatrix in the presence of the notary and all the witnesses, at one and the same time; and was not read in the presence of the testatrix and the said notary.

All of these charges appear to have been made recklessly, as no evidence was offered in support of any except as to the alleged insanity of the deceased; and the evidence on that point does not sustain the charge.

Mrs. Frank Brinker and Mr. Frank Brinker, a cousin and her husband, of the deceased, produced two other wills, olographic in form, which they asked might be filed, and that the later one might be admitted to probate in the event that the nuncupative will

by public act was declared null and void; and, further, in the alternative, that the will of earlier date be admitted to probate in the event that the later olographic will should be rejected.

Mrs. Baumann attacked the two olographic wills, alleging that they were forgeries and asked that they be rejected. Evidence was taken on this point; but, the nuncupative will by public act has been decreed by the trial court to be a valid will, and as that judgment will be affirmed it will be unnecessary to consider the evidence referring to the two olographic wills.

[1] The defendant in the cause, Mrs. Frank Brinker, introduced evidence on the question of the sanity of the deceased which is quite satisfactory to the court. It consists of testimony by the attending physician of Miss Miller during her lifetime, particularly during her last illness, her dentist, her nurses, her minister, her bankers, her friends, her neighbors, her lawyers and notaries, merchants with whom she traded, and various other persons, all of whom are credible, and they testify to the sanity of the deceased. Some of plaintiff's witnesses testify to the same effect.

In addition to the testimony of the witnesses referred to above, there are the three wills of the deceased which are regular in form, and which disposed of all·of her property in a reasonable way. In all three wills the testatrix makes bequests to two charitable institutions in which she was deeply interested, and toward the support of which she regularly contributed during many years. In the two olographic wills she made provision for an only brother, who died before the nuncupative will was made. To her cousin, Mrs. Rosalie Brinker, wife of Frank Brinker, she bequeaths "the balance of my estate, real, personal, or anything I may die possessed of," "for her care and kindness to me during my sickness, she also being my best friend and companion during my lifetime." This bequest, taken together with the evidence showing that the deceased and Mrs. Brinker were near relatives and had been close friends since their childhood, shows capacity on the part of the testatrix to appreciate kindnesses, attention, and friendship. The bequest was most natural and reasonable. The two cousins had been early associated in life by the taking of Mrs. Brinker by Mr. Miller, father of the deceased, into his home, when she was 12 years of age. After the death of Mr. Miller, Miss Miller became an inmate of Mrs. Brinker's home, she being a married woman at that time, and she remained there. There is nothing whatever sounding in folly in the confection of this last will and testament. It is the act of a sane person.

[2] Miss Miller attended to her own finances through several banks in which she made deposits. She attended to this business herself; she made entries in bank stub books, and wrote and signed all of her checks; and, in most instances, she appears to have regularly drawn the money from the bank where it had accumulated and where interest was not paid on deposits, and then deposited it in a savings bank where it earned interest. This showed good judgment and business sense on her part. This close attention to business resulted in an increase of the fortune inherited by her from her father and mother's estate from $187,575.98 in 1901 to $227,492.16 at the time of her death in 1916. This evidence is quite conclusive of Miss Miller's ability to take care of her property and to dispose of it by last will and testament. If she was assisted during these years it is clear that she had the good sense to have selected as an assistant one who was capable and honest.

And then, there are letters, postal cards, address books, and other memoranda going to show that the deceased was capable of

composing and writing letters, etc.; and the contents of the letters show that she was appreciative of courtesies from friends, and that she had sufficient intelligence to give entertaining descriptions of her travels. She also wrote letters for friends who could not write. Her photographs are also in the record, and they indicate that she was the ordinary woman, not at all lacking in mentality.

Opposed to this strong array of evidence the plaintiff introduced several witnesses to testify to peculiarities and idiosyncrasies on the part of the deceased extending through a long life of 54 years, but none of which touch the period about the time of the making of the nuncupative will. Some of these witnesses testified to the insanity of the deceased; but the weight of evidence on this point is with the defendants who denied that the deceased was an insane person.

Plaintiff called to the stand two physicians who testified on her behalf. One, in answer to a hypothetical question propounded to him by counsel for the plaintiff, said that the person covered by the question was mentally inferior, a moron, which he described as a high-grade imbecile. But in answer to a hypothetical question propounded by counsel for the defendant, based upon the testimony of some of the witnesses, he answered, "That is a person of sound mind." The other expert testified that he had attended the father and brother of the deceased, but that he had "never had any conversation with her," referring to the deceased. He stated that she had the "characteristics of a simple-minded person"; "of one incapable of grasping any ideas, one of a childish nature, such as their conduct was." On being asked, "How did you get the idea that she was simple-minded?" he answered, "From her conduct; her conduct was that of a child around the house." In answer to the question, "I just want to know how you came to get that idea?" he answered, "I didn't know her; it was from her physiognomy; the general contour of her head and general get-up; her manner—all conveyed to me the idea that she was a person of undeveloped mind." "She had all the characteristic appearances of a simple-minded person, but whether she was competent to make out a check, I don't know. I don't know whether she had any education, whether she could write, I couldn't say; but I know they take the mentally deficient and bring them up to the mechanical action of writing." As the opinion of the witness was based upon an observation of the characteristics of the deceased, and not upon an examination or upon a conversation held with her, it cannot weigh against the positive testimony of the attending physicians, bankers, business men, a minister of the gospel, and other reliable and competent persons who had come into contact with her, as well as the written evidence left by her in the shape of wills, letters, etc., which went to show that the deceased was a sane woman.

The record clearly shows that the deceased was of sound mind and memory, and was entirely capable of disposing of her property by last will and testament, and she has done this in a legal manner.

Judgment affirmed.