(91 South. 519)

No. 24834.

McDONALD et al. v. BAKER et al.

(April 3, 1922. Rehearing Denied April 24, 1922.)

(Syllabus by the Court.)

1. Issues involved.

Involves only issues of fact.

(Additional Syllabus by Editorial Staff.)

2. Wills ⬳55(1)—Evidence held to show sanity.

In a suit to set aside a will, evidence held to show that the testator was not insane.

Appeal from Second Judicial District Court, Parish of Webster; Robert Roberts, Jr., Judge.

Suit by W. W. McDonald and others against R. A. Baker, executor, and others. From a judgment for defendants, plaintiffs appeal. Affirmed.

William W. McDonald, of Shreveport, and Paul A. Sompayrac, of New Orleans, for appellants.

L. K. Watkins, of Minden, for appellees.

By Division C, composed of Justices DAWKINS, ST. PAUL, and THOMPSON.

ST. PAUL, J. This is a suit to set aside the will of one John W. McDonald on the ground of insanity.

## I.

[1, 2] We gather from the evidence that he was one of the most prominent citizens of the town of Minden in Webster parish; a man of considerable social prominence, having a wide acquaintance and fairly extensive business connections; cashier and active manager of the oldest bank in the community; universally respected and widely-consulted on business affairs; a bachelor, living in his own home with a widowed sister.

The deceased executed his will about eight months before his death, when he was on the point of taking a somewhat extended trip for a vacation. The will is written on a double sheet of legal cap paper, which he is shown to have procured for that express purpose; and the will covers exactly the four pages thereof. It is all written, dated, and signed in his own handwriting. The writing is steady and perfectly legible. The language and thought are perfectly clear. There are no erasures, interlineations, omitted, misused, or misspelled words, with the single exception of the word "plantation," which is spelled "plantion," but the words "uncertainty, adjoining, appreciation, furniture, silverware, deceased, executor and handwriting" are all more difficult to spell and yet are all spelt correctly; showing that this was only a slip of the pen and not a slip of the mind.

The will, when compared with the inventory, shows that the deceased was perfectly acquainted with the state of his affairs. He had exactly 160 shares of bank stock, and the will distributes precisely that number of shares among nine different legatees. He had $1,600 of Liberty Bonds, of which he gives $1,000 to one legatee and $600 to another.

He owned some cattle and two pieces of real estate, a plantation and a home; and all are mentioned particularly in his will. He had an older sister, widowed and crippled, of whom he took care. He leaves her the usufruct of the plantation; but, realizing that in her condition she could not manage it, he appoints his nearest and most trusted business associate to manage it for her; and, to make sure that the latter will not neglect his sister's interests, he fixes a compensation for the services to be rendered. He makes special legacies of the contents of each room of his home, describing such contents; and it is not pretended that this description is not correct.

He names *all* his blood relations in his will but one; describing them as sister, niece, nephew, great-niece, great-nephew; stating even their parentage, and number; and it is not pretended that there is any error or confusion about it. To two blood relatives (nephews) he leaves nothing; but he makes a legacy to the daughter of one of them, giving her full name and designating her as his great-niece, and the daughter of that very nephew.

Suffice it to say, without going further into details, that neither the everyday actions of the deceased, nor the will executed by him, gives the least indication of an unsound mind. And the only question is whether the other testimony in the record shows that, regardless of a sensible will and sensible

conduct, the deceased was yet so mentally infirm as to be incapable of making a will.

## II.

The evidence on this point is confined exclusively to the testimony of two expert alienists and a number of physicians in general practice, none of whom examined the deceased; and who give their opinion in answer to the following hypothetical question (or questions substantially the same):

Question. "Doctor, if a person with syphilis, producing gumma on the brain, is so seriously stricken by the malady in January, 1918, as to produce diplopia, arteriosclerosis, mental disturbance, and impediment in the gait (and) neglects or refuses to keep up a regular anti-luetic treatment, what would be the condition of the patient's brain on July 27, 1920, as compared with January, 1918 (improvement or increased mental infirmity)?"

Which question, of course, answers itself, since the substance thereof is simply this:

"Doctor, if a person be visibly afflicted with incurable insanity at a given date, and neglects all treatment, will his condition improve or grow worse in the next 30 months?"

But this question is *purely* hypothetical, and does not fit in any way the condition of deceased; as is virtually confessed by the following question put to the same experts:

"Would the fact that the impediment in the gait *had improved*, and diplopia been *relieved by wearing glasses*, necessarily prove that the patient's brain power had been restored to normal?" (Italics ours.)

And, of course, it would not; but it *would* go a long way to show that the patient needed glasses to enable him to watch his step, more than he needed anti-luetic treatment.

For the rest, the only evidence of "mental aberration" is the fact that the deceased had a nervous breakdown in January of 1918, during which his tongue grew a little heavy, and his defective vision was noticed for the first time; but from this he appears to have recovered completely long before his death.

A number of physicians, who saw or treated the deceased, and were well acquainted with him, found him perfectly sane. And a host of bankers, business men, and neighbors saw no evidence whatever of anything abnormal about him, beyond the fact that he was visibly affected by the unexpected death, away from home, of his widowed sister, the last of those who had at any time formed part of his own *home* circle.

Finally, the physician who attended him in the breakdown of January, 1918, and on whose testimony the whole theory of insanity rests, declares distinctly that he found what he thought to be evidence of a syphilitic condition, "but you could not call it *paresis*, only mild symptoms of paresis"; that the impediment in speech was not pronounced, though "you could discern it"; and the impediment in his gait "did not last very long." And when this witness is recalled we find the following (Transcript, vol. 2, p. 218 et seq.):

"Well, he did not seem to be himself altogether, while I did not consider him an insane man; seemed to go around and attend to his business all right. * * *

"I did say, and will say again, that he was not actually insane in the way that the layman looks at insanity; but that this disease which he had would impair the brain and that he would not be mentally as strong as if he had not had this disease. * * *

"I told him (plaintiff) that he was not actually insane. * * *

"I think there is a difference between a man that is mentally deficient and one who is actually insane. * * *

"Now, when you met him on the street, or in the bank, or in a social way, he seemed to be all right?

"Yes, he seemed all right.

"Didn't his gait get perfect again?

"As far as I could tell, it did.

"Didn't he appear to recover and become a well man again?

"Well, all of them appear to improve, and he was much better when he went to New Orleans. In fact, the conditions seemed to clear up as far as the diplopia was concerned. Of course, the arteries didn't seem to get any better, but we would not expect that.

"He was a man that indulged his appetite in eating and in drinking?

"Yes, sir. * * *

"Lived pretty good and his habits were sedentary?

"Yes, sir. * * *

"A man living that way at his age of life (57) is liable to have hardening of the arteries?

"Yes, sir."

The foregoing is but a bird's-eye view of the evidence, which covers several hundred closely typewritten pages. But we think it sufficiently shows that there is no basis for the charge that the deceased was *insane.* The district judge, who reviewed the evidence more in detail, reached the same conclusion.

#### Decree.

The judgment appealed from is therefore affirmed.

Rehearing refused by Division A, composed of Chief Justice PROVOSTY and Justices OVERTON and LECHE.