(92 South. 61)

No. 25021.

### Succession of FORD.

### Opposition of FORD.

(May 1, 1922)

*(Syllabus by Editorial Staff.)*

1. Wills ⊚══55(1)—Evidence held to show testamentary capacity.

Evidence *held* to show that a testator was in an enfeebled condition both mentally and physically, and that his mental condition was somewhat abnormal, but not to such an extent as to incapacitate him from making a valid will.

2. Wills ⊚══37—Not invalid though made by insane person during lucid interval.

That a testator was partly or even wholly insane at times would not make his will invalid if made during the existence of a lucid interval.

3. Wills ⊚══52(3)—Provisions held to raise presumption that it was made during lucid interval.

Where a will, aside from a legacy to a second cousin, gave the testator's property to his children and grandchildren by a negro woman, in accordance with intentions expressed at a time when his mental condition was conceded-

ly normal, it raised a presumption that, if the testator was insane, it was made during a lucid interval.

4. Evidence ⊚══574—Opinion evidence must yield when opposed to facts.

Opinion evidence, however weighty or plausible, must yield when opposed to facts.

Appeal from Second Judicial District Court, Parish of Bossier; Robert Roberts, Jr., Judge.

Proceeding on the opposition of G. S. Ford to the probate of the will of James A. Ford, deceased. From a judgment admitting the will to probate, plaintiff in opposition appeals. Affirmed.

Barnette & Roberts, of Shreveport, for appellant.

Murff & Mabry, of Shreveport, for appellee.

By Division C, composed of Justices DAWKINS, ST. PAUL, and THOMPSON.

ST. PAUL, J. The opinion and judgment of the learned and able district judge sets forth fully and disposes correctly of the issues herein involved, and we adopt it as our own. It is as follows:

Roberts, J. This is a contest over the will of James Auvergne Ford, who died at his home in Bossier parish, near Plain Dealing, during the month of August, 1921. The deceased left a last will and testament, olographic in form, under the provisions of which all his property was left to his negro children and grandchildren, excepting a legacy of $1,000 to a second cousin, Mrs. Luther Boggs, of Plain Dealing.

The will appears to have been written on February 1, 1921, some six months preceding the testator's death. It was offered for probate on August 24, 1921, and three days later an opposition to the probate of the will was filed by G. S. Ford, a surviving brother of the testator, on the following grounds: First, that the will was not wholly written, dated, and signed by the testator; second, for the reason that the colored mother of the legatees was, at the time of their birth and conception, married to a man other than the father of the legatees; third, that the testator was at the time of the confection of the will of unsound mind, and therefore not capable of giving his consent to the things expressed in said will.

Upon the trial of the case the first and second grounds of attack were abandoned, and not urged, thus leaving as the only issue for determination the question of the testamentary capacity of the deceased at the date of the confection of the will.

### The Testimony.

Mr. G. S. Ford, the opponent of the probate of the will, testified that some time during the year of 1917 his brother, the testator, fell into a very low state of health, both physically and mentally, and that, due to his mental condition, opponent brought his brother to Benton with the view of having him interdicted. After arriving at Benton with the patient, and after a conference, participated in by Dr. Bell, the testator's physician, Judge A. J. Murff, at that time attorney for the testator, and by the presiding judge, John N. Sandlin, it was decided to place the testator in a private retreat at San Antonio, Tex., instead of interdicting him and sending him to one of the state's institutions for the cure of the insane.

There can be no doubt that the testator was in a bad way both mentally and physically at the time he was carried to San Antonio. The testator, as it appears, was a lover of fine cattle, had a mania for buying them, as the opponent puts it, and advantage was taken of this "mania" to lure him over to San Antonio, where Dr. Bell was going, as he represented, to meet his brother, also a lover of fine cattle. Dr. Bell accompanied the testator to San Antonio, but after they arrived in that city, instead of meeting Dr. Bell's brother, and buying fine cattle together, the testator was incarcerated in the Moody's Sanitarium, where he remained from some time in June, 1917, until the following December. When released from Moody's Sanitarium, on December 3, 1917, the testator was greatly improved in his physical condition, having gained about 50 pounds in weight, and was also greatly improved in his mental condition, though still, according to Dr. Moody's testimony, somewhat nervous and excitable.

Originally it appears that there were three of the Ford brothers, M. L., who died several years ago intestate, and whose property, which was considerable in amount, was inherited by the two surviving brothers, J. A., and G. S. Ford, J. A. being the deceased testator and G. S. the opponent in this proceeding. All three of the brothers were men of above average intelligence, and all possessed considerable property, both inherited and acquired. The two older brothers, M. L. and J. A., appear to have possessed college training, and both were veterans of the Civil War. After their return from the Civil War to their ancestral plantation home near Plain Dealing both of the older brothers took up with negro women, with whom they lived in the same houses, and by whom respectively each reared families. This strange and shameless departure from the paths of social rectitude and racial integrity by the two older brothers was imitated by the younger brother, G. S. Ford, opponent herein, who also took unto himself a colored woman, by whom, he admitted upon the witness stand, he had reared a family of five or six colored children, to some of whom he has already given off a portion of his property.

Thus it will be seen that the situation created by the death of the older brother, M. L. Ford, intestate, and the resulting passage of his property to the two surviving brothers, was capable of being made quite advantageous to the children of J. A. Ford and G. S. Ford, and quite disadvantageous, if not unfair and unjust, to the children of M. L. Ford. The testator, J. A. Ford, and G. S. Ford, discussed with each other the inequities of this situation with reference to M. L. Ford's children, and it appears that they were agreed that M. L. Ford's children should be provided for either by gifts of money or by transferring to them the property which had been inherited by J. A. Ford and G. S. Ford from the older brother. J. A. Ford, however, died without having carried out what appears to have been his good intentions with regard to the predeceased brother's children, and this fact is given by G. S. Ford as one of his reasons for asserting that the testator was insane, and, inferentially, as one of his reasons for opposing the probate of the will, in order that he might right the injustice thus done the offspring of M. L. Ford. It is to be noted in this connection, however, that the legatees under the will have proposed to the opponent to transfer to M. L. Ford's children that portion of J. A. Ford's estate inherited by him from M. L. Ford, or at least an amount equal to what the opponent may be willing to transfer to them; but up to the date of trial the opponent was unwilling to accede to this proposition.

Another reason given by opponent why he thought the testator insane was that testator cut down the big oak trees in his yard and hauled a lot of rock preparatory to building a thousand dollar storm house.

Dr. Bell, testator's physician, thought the testator was insane at the time he took him to the Moody's Sanitarium at San Antonio, and that testator never fully recovered his mental equilibrium. The testator was greatly incensed at Dr. Bell and G. S. Ford for their part in

having him incarcerated in an insane asylum, and up to the day of his death seems never to have fully forgiven them, although he acknowledged the great benefit to his health accruing from their action. Dr. Bell did not again treat or attend the testator following his release from Moody's Sanitarium, until about February 1, 1921. One of the reasons Dr. Bell gave for believing the testator insane at the time of making the will was the testator's unappreciative attitude towards those instrumental in sending him to the Sanitarium, and another reason was that testator questioned the justice of Dr. Bell's bill for services rendered in that connection, testator seeming to feel that G. S. Ford, having instigated his detention, should bear the expense connected with same.

Dr. Lyons fully concurred in Dr. Bell's views as to the unsound mental condition of testator; Dr. Lyons had treated the testator frequently following his return from San Antonio, and continued to serve as his physician up to February 1, 1921, at which time testator discarded his services, and again called in Dr. Bell. Dr. Lyons' conclusions were based on the unceremonious manner in which testator had dismissed him, and on the unreasonable resentment manifested by testator toward Dr. Bell for the part played by the latter in having him detained in an asylum for the insane. Dr. D. J. McCann, basing his opinion on the testimony of Drs. Bell and Lyons, concurred in their views of the testator's mental unsoundness.

On the other hand we have the testimony of Judge A. J. Murff, who was testator's counsel, and aided him in preparing the will, that testator was in a normal mental condition at the date of the confection of the will, and, for that matter, at all other times was sufficiently at himself mentally to make a valid disposition of his property.

The will itself is couched in good language, and contains nothing "sounding to folly," but its probative value as throwing light on the testator's mental condition is greatly weakened, if not entirely destroyed, by the fact that the will was first written by Judge Murff and afterwards copied by the testator. The record contains, however, a number of other documents written by the testator which throw light on the question of his mental condition. There is a letter bearing date of July 13th, 1921, addressed to the clerk of court, inquiring as to whether his daughter, Motie Graham, had mortgaged her property to Murff & Mabry for $400. This letter certainly contains nothing indicative of insanity. While detained in the sanitarium at San Antonio the testator wrote a letter to Mrs. H. L. Boggs, to be handed by

her to Dr. Bell and his brother, G. S. Ford. The letter to Mrs. Boggs is such a letter as might have been written by an intelligent, high-strung old man who felt that he was being cruelly and unjustly detained in a retreat for the insane. The letter of February 1st, addressed to Judge Murff, in which testator requested the attorney to come immediately to assist him in drawing his will, has been the subject of special comment by opponent's able counsel, as indicating that testator was of unsound mind. It is apparent that one or two words and phrases were left out in the composition of this letter. After the word "much," for instance, the word "oblige" was evidently intended. These omissions in the court's opinion indicated nothing more than haste or mental distraction due to illness.

Mr. Odom, Mr. Wise, and Mr. Cody, all neighbors of testator, never observed anything in his conduct indicative of insanity. The same may be said of his merchant, Mr. Cochran. If the testator had been regarded as a crazy man in the community in which he lived, it seems strange that none of his neighbors have been brought forward to testify to that fact. Judge Murff had been the testator's friend and adviser for many years, and the testator had discussed with him at a time when his mental condition is conceded to have been normal the disposition he desired to make of his property. The will carries out those intentions in every respect except the giving of something to the children of M. L. Ford, and the failure to do this is explained by the fact that death overtook him before his intentions in this regard were carried out.

Testator's failure to leave anything to G. S. Ford is explained by the fact that he did not deem his brothers in need of his bounty, and by the further fact that testator still nursed a grudge against him on account of the San Antonio incident. It is further shown that the testator left his property to those who enjoyed his affection, and for whom he felt himself to be under a natural obligation to provide.

Viewing the testimony as a whole, the court is of the opinion that the testator at the time of the confection of the will was in an enfeebled condition, both mentally and physically; that, due to old age, ill health, and possibly a bad conscience, the testator's mental condition was somewhat abnormal, but not to such an extent as to incapacitate him from making a valid will. The court has great respect for the professional learning and admiration for the high character of the physicians who testified in the case, but under the jurisprudence of Louisiana, does not feel that they have pointed

to anything in the conditions of the testator that justifies the court in substituting the opponent's wishes for those of the testator in the disposition of the latter's worldly goods.

## Opinion.

[1] In the recent case of W. W. McDonald et al. v. R. A. Baker et al., decided in Webster parish (affirmed by Supreme Court, 150 La. 1084, 91 South. 519), this court had under consideration a case similar to the one at bar. In the McDonald Case the court used the following language and discussion of authorities, which we think equally pertinent to this case: "The human mind has been called the mystery of mysteries. There is a shadowy and twilight domain between sanity and insanity, peopled by many insane acts of sane persons, and by many sane acts of insane persons." And, considering the diligence with which the plaintiffs have delved into the life of the testator, the great wonder is that they have not been able to bring to light some greater acts of folly or weakness than any that were brought out.

The contention of plaintiffs that the testator suffered from a species of occult insanity destructive of testamentary capacity, but not observable by the ordinary layman, finds no support in reason or common sense, nor in a voluminous jurisprudence on the subject.

In the case of Chandler v. Barrett, 21 La. Ann. 60, 99 Am. Dec. 701, it was proved that the testatrix once ran upon the roof of a house trying to escape from an imaginary robber; that she once burned all her clothing; that she suspected her children of intending to boil her in a kettle, and had committed many more incongruous acts than any charged against the testator in this case; and yet the Supreme Court refused to set aside her will.

The case of Kingsbury v. Whitaker, 32 La. Ann. 1055, 36 Am. Rep. 278, is strikingly like the instant case in some of its aspects. The testator, Bowditch, was an elderly, unmarried man, and had made an olographic will in favor of a sister whom he loved to the exclusion of other sisters and nephews and nieces for whom he did not care. Bowditch was frequently arrested and confined sometimes in jail, and three times in different insane asylums. A "feature of incurable insanity, relied upon by plaintiffs, is in his mania [of the testator] for picking from the streets cigar stumps, rags, garbage, and other stuff, and carefully storing the same in his room as valuables."

In this leading case, the court pertinently remarked: "To wrest a man's property from the person to whom he has given it, and to divert it to others from whom he has desired to withhold it, is a most violent injustice, amounting to nothing less than post mortem robbery, which no court should sanction, unless thoroughly satisfied, either that the dispositions of the will are reprobated by law, or that the testator was legally incapable to make a will. The testator, in the present case, has violated no provision of the law. His will is legal in form. Its dispositions are appropriate and conflict with no requirements of public policy or of natural duty. It is not within the description of the Testamentum Inofficiosum of the Roman law, which only applied to wills disinheriting children or parents. The testator left neither ascendants nor descendants. The law imposes no obligation to provide for collateral relations, either during life or at death. The position which the law assigns them in the order of intestate inheritance is based, in no degree, upon the idea of duty due them from the deceased, but simply upon the presumption of affection; and when this presumption is rebutted by the facts, their claim has nothing to rest on and falls to the ground. A man hath as complete liberty to deprive them of any share in his estate as if they were strangers to his blood."

And, going on further, the court remarks: "The fact that a man is subject to disease of the brain is, per se, no better reason for depriving him of testamentary power than would be his having a disease of the liver. On the contrary, as we have seen, the liability to infirmity which is the inheritance of man, and the consequent need of care and attention, are amongst the most powerful reasons for testamentary freedom. The real question is, whether the brain or other physical organ, whatever it may be, which is the medium through which the action of the mind is manifested, is so diseased or impaired as to make it an untrustworthy vehicle for the conveyance of the true wish or will of the testator, unbiased by any delusion which may be the result of such disease. The law fixes the time for the application of this test, at the moment when the will is made, and expressly recognizes the capacity of persons, subject at times even to complete dementia, to make a will in lucid intervals. When the will is established to have been made by the testator himself, unaided by others and when its provisions and expressions are sage and judicious, containing nothing 'sounding to folly,' these facts establish a presumption, even in cases of persons habitually insane, that it was made during the existence of a lucid interval, and impose upon those who attack the will the burden of proving insanity at the moment when it was made."

[2, 3] It will thus be seen that, even if we accept the opinion that the testator was partly or even wholly insane at times, it would not follow that the will is invalid. The will itself is such in its provisions as to establish a presumption that it was made during a lucid interval.

The only evidence offered of the testator's insanity at any time, and particularly at the time of the making of the will, is the theoretical opinion evidence of the experts. On this point, Wharton & Stille, p. 415, says: "Opinions of neighbors of good common sense, who had opportunity to observe, are sometimes regarded as of more weight than those of experts, especially where the opinions of the experts are not well supported by facts and reasons." And on page 393, the same authors say: "Expert evidence as to insanity is to be received with great caution, and subjected to patient and intelligent investigation."

[4] This court has the greatest respect for the physicians who have testified in this case, and has carefully weighed their testimony, along with that of all the other witnesses in the case, but, however weighty opinion evidence may be, and however plausibly it may be supported by theoretical reasoning, in courts of justice such opinions must yield when opposed to facts.

The following is a partial enumeration of the cases involving the question of testamentary capacity, which have guided the court in reaching an opinion adverse to the plaintiff's claims in this case. Kingsbury v. Whitaker, 32 La. Ann. 1055, 36 Am. Rep. 278; Godden v. Burke's Ex'rs, 35 La. Ann. 175; Chandler v. Barrett, 21 La. Ann. 60, 99 Am. Dec. 701; Succession of Bey, 46 La. Ann. 778, 15 South. 297, 24 L. R. A. 577; Succession of Morere, 114 La. 514, 38 South. 425; Succession of Jones, 120 La. 986, 45 South. 965; Succession of Bradford, 124 La. 44, 49 South. 972, 18 Ann. Cas. 766; Succession of Schmidt, 125 La. 1065, 52 South. 160; Succession of McDermott, 136 La. 80, 66 South. 546; Wood v. Salter, 118 La. 695, 43 South. 281; Succession of Miller, 142 La. 386, 77 South. 290; Succession of Brugier, 146 La. 29, 83 South. 366.

In the instant case the opponent himself, subsequent to testator's return from San Antonio, treated him as a man capable of managing his own affairs by dealing with him in the buying and selling or partitioning of real estate. Under these circumstances it would seem he should not complain if the court does likewise.

For the reasons given, the opponent's demands are hereby rejected at his costs, and it is hereby ordered and decreed that the last will and testament of James Auvergne Ford be admitted to probate.

### Decree.

The judgment appealed from is therefore affirmed.