No. ——

First Circuit

## DRONETTE v. MEAUX BROTHERS

(Feb. 12, 1927. Opinion and Decree.)

*(Syllabus by the Editor.)*

1. **Louisiana Digest—Appeal—Par. 625.**

The finding of the trial court on a matter of fact, namely, that kerosene and not gasoline was delivered by defendant to plaintiff, being manifestly correct, is affirmed.

Appeal from Vermilion parish. Hon. W. W. Bailey, District Judge.

Action by Alphe Dronette against Meaux Brothers.

There was judgment for defendant and plaintiff appealed.

Judgment affirmed.

Gremillion & Smith, of Crowley, attorneys for plaintiff, appellant.

Kitchell & Boudreaux, of Abbeville, attorneys for defendant, appellee.

MOUTON, J. While engaged in lighting a fire in a heater in his home on the morning of Feb. 10, 1918, an explosion occurred, resulting in severe personal injuries to plaintiff, for which he sues defendant firm in the sum of $21,000.00.

His demand was rejected. He appeals.

Plaintiff bought a barrel or drum of oil from the defendant in November, 1917. He was then living in Kaplan, where the oil was delivered to him by defendant, through his teamster, Bouillon. Plaintiff contends that instead of sending him kerosene oil which he had bought, defendant delivered a barrel of gasoline, which, he alleges, caused the damages of which he complains. It is on a proper solution of the controverted issue as to whether kerosene or gasoline was delivered to plaintiff that this case depends.

Plaintiff was attempting to start a fire in his stove or heater when the accident happened. He says he put corn cobs first in his coal heater, then kindling, then oil and coal on top. After doing this, he says he applied a match thereto, and started his fire. After starting the fire, he sat down for a while, in his underwear, then put on his clothes and noticed that the fire was not "burning good", but was going down. After he was dressed, he says, he looked into the stove, saw a small "flame the size of a match", took the oil tank and poured some oil from the top and closed the stove, sat down and placed his hand on the oil tank which rested on his knee. He explains that after thus pouring the oil and taking a seat in a chair in front of the heater, a flame shot out from the heater and the tank he was holding on his knee, which was a gallon glass jar, exploded, and caused the injury.

Plaintiff was alone at the time and the above is substantially the narrative he gives of the occurrence. He was living in Kaplan when the oil was delivered to him in November, 1917. About two months thereafter he moved in the country, where some two weeks later, he was burned as the result of the explosion. He is positive that the oil which he was using in the glass jar to start the fire had been taken from the barrel he had received from defendant at Kaplan, and which he had carried to the country when he moved there. Simpson, an employee of the Board of Health, made a test of

this oil with a Taglibue thermometer and hydrometer which are used to register the gravity and heat of oils. He found that the oil registered 52½ degrees. He also made what he terms a flash test. The temperature of the ·day was at 86 degrees when this test was made, and under his test the oil flashed at 89 degrees. He explains that in making this test he poured some of the oil in a cup, lighted a match, passed it 6 inches above the cup, and that the oil flashed. He pronounced it a low grade gasoline oil, as dangerous and explosive.

Plaintiff contends that from the manner in which the explosion occurred, and the test made by Simpson, it clearly appears that the oil in question was not keresene which he had bought, but was gasoline. In support of his contention that the oil was gasoline, he refers to the testimony of Dr. Saparita, who attended to plaintiff soon after the accident. Dr. Saparita says the Ford car he was driving ran out of gas at about a quarter of a mile from plaintiff's home from where they drove him in a buggy to the home of the plaintiff; that Francois Dronette, father of plaintiff, gave him about one gallon of oil which he presumes was from the barrel in question, and that he drove his machine back to Kaplan, a distance of about 3½ miles. He says he stayed in the house anywhere between 40 and 60 minutes, he believes, and that when he got back to his car "it had cooled off some". He remarks, however, that in returning to Kaplan, the machine stopped several times, and that it did not run as well as with gasoline. From the fact that Dr. Saparita ran his car back to Kaplan, with the oil furnished him from the barrel which plaintiff says he bought from defendant firm, counsel for plaintiff contends that this affords strong corrobora-

tive evidence showing that the oil in question was gasoline and not kerosene.

Homer LeBlanc, a witness for defendant, says that he ran his Ford car with kerosene and mentioned a particular occasion when he drove it about six miles with that kind of oil at which time he says he was in company with Luther Fletcher, who corroborated this statement. Fletcher runs a garage and doubtless has some experience in running automobiles. In addition to his statement given in corroboration of Leblanc's testimony, Fletcher says that he frequently used kerosene to run his Ford car, and that it will run it when the engine is cold.

No doubt kerosene, as a motive power, is not as effective as gasoline, but under the evidence of Leblanc and Fletcher, it appears that kerosene will run a car, and according to the testimony of Fletcher, that it will start and run a car even when the engine is cold.

This evidence shows, that though the engine of Dr. Saparita's car had cooled off when he used the oil in his car, it could have been kerosene, although he ran it back to Kaplan. The fact that it stopped several times in such a short route, rather sustains, to a certain extent, the contention that it was kerosene and not gasoline he was using.

The barrel of oil under discussion was delivered to Bouillon for plaintiff, by Emile Meyers, who was then the manager of defendant's store at Kaplan. Meyers testified in the case, but has died since the trial. He explained, in his testimony, that the store of defendant is 85 feet long and 55 feet in width; that he stored the gasoline at the southwest corner of the store, and the kerosene at the northeast end, at a distance of about 140 feet. He bought his supply of oil, gasoline and

kerosene from the Waters-Pierce Oil Company, at Abbeville. This drum or barrel, in question, he says, he first filled with gasoline and sent it to Montgomery, who was threshing rice. He says it was returned by Montgomery with two other drums and that he set it back with empty drums; that he drained it and then rinsed it with kerosene, and that it was refilled with kerosene in his presence. It may not be amiss to remark here that it is shown by the testimony of Montagne that it is customary for his company to rinse barrels with kerosene in which gasoline has been stored, and to refill them with kerosene; also, by the testimony of Read, a chemist, who testified in the case, that no deleterious effects can result from the refilling of such barrels with kerosene after having rinsed them with that kind of oil. Now, returning to the testimony of Meyers on this subject, we find that he gives the number of 90346 as being that of the drum he had sent to Montgomery as hereinabove explained; he says he is positive that he delivered to Bouillon for plaintiff, the identical drum after he had refilled it with kerosene oil. He was examined and cross-examined and never deviated in the slightest from this statement, in which he remained positive and unshaken.

The oil, gasoline and kerosene, which defendant bought for its stove, were loaded by the Waters-Pierce Company at Abbeville. Counsel for plaintiff questioned Meyers very closely on the proposition as to how he could tell that no mistake had been made at the loading place between the two oils, resulting possibly in the putting of the oils in the wrong cans. The answer of Meyers was that no such mistake occurred in the instant case, because he had used the oil himself, had sold it to many customers, and that no complaint had ever been made, with the exception of plaintiff who claimed gasoline had been delivered to him instead of kerosene. Naturally, these customers who bought the oil for kerosene, must have used it in lamps and stoves for which it is usually purchased, and it is indeed strange that plaintiff only should have suffered from its use. The fact is that it was shown by Mrs. Raush, a witness for defendant, that she had borrowed a bottle of the oil in question from the wife of plaintiff, had used it in her lamps, without any resulting trouble or accident.

Mrs. Comeaux, another witness for defendant, says she borrowed a gallon of this oil from plaintiff's wife, and used it in her lamps and also in her stove, without any trouble or difficulty. In connection with this testimony it is proper to consider the way in which the explosion occurred. In explaining how the accident happened, plaintiff says, he placed corn cobs in his heater and kindling, coal on top and applied a match. After the fire started, he sat down and then dressed. He noticed the fire was not burning as he expected, looked in the stove, saw a small flame, then poured the oil in the stove from the glass jar, closed the stove, and sat down again; while holding the jar in his hand, that a flame shot out of the stove and exploded the jar. It is difficult to say with any degree of accuracy how much time intervened between these various acts, that is, from the time the match was struck, and the explosion happened. It is perfectly safe to say that several seconds must have transpired from the striking of this match to the ultimate time of this unfortunate occurrence.

The facts above outlined were submitted in the form of an hypothetical proposition to Frank C. Read, chief chemist of the Standard Oil Company of Louisiana, and

upon which he was asked to give an expert opinion. His answer thereto was that after the pouring of the oil by plaintiff, and the application of the match, if the oil had been gasoline, there would have been an immediate explosion following the stream of gasoline to the glass jar, and before plaintiff would have had time either to close the heater or to sit down. He also explained that if the oil had been gasoline, when plaintiff poured it in the stove on the small flame which plaintiff said was burning then, an instantaneous explosion would have occurred, the glass jar which contained the gasoline would have been shattered, and before plaintiff could have sat down in front of the stove, the explosion would have occurred. He testifies that a spark from a cigar will ignite gasoline, and that it would ignite quicker from a flame. He explains that the smallest flame would cause it to follow up to the source of supply, even if it were dripping then in drops, and an explosion would result. This would be the result, he explains, from a liquid which would flash from a flame at 6 inches therefrom and at a temperature of 89 degrees, which the evidence shows were the conditions under which Simpson, expert for plaintiff, made his flash test as above referred to. Read says his opinion is based on thousands experiments which he made during his service of 12 or 13 years as chemist for the Standard Oil Company.

Counsel warns us against the danger of accepting expert opinion in general; and says, that opinion evidence, however weighty or plausible, must yield when opposed to facts, citing in support of this proposition Succession of Ford, 151 La. 571, 92 So. 61. If the opinion of Read were opposed to the facts we would not hesitate to discard it, but we find that instead of being in conflict therewith, it is in harmony with the substantial facts and circumstances of this case which are determinative of the issue presented.

Read also testifide as to the use of gasoline in lamps or stoves constructed for kerosene. He says that gasoline could not be used in such lamps or stoves without incurring the danger of immediate explosion. This testimony is in line with the common experience of laymen in matters of this character. It is therefore impossible to believe that if the oil delivered to plaintiff had been gasoline that when it was used by the many customers of defendant company and by Mrs. Raush and Comeaux, who testified in this case, that no explosions would have occurred, not even any trouble or disturbance in their lamps or cooking stoves. This is unbelievable. The preponderance of the evidence instead of showing that gasoline was delivered to plaintiff indicates that it was kerosene. If the preponderance is not in favor of defendant, the evidence is so sharply conflicting that its weight is about equally divided, and if not equally divided, there is certainly no manifest error in the judgment appealed from to authorize a reversal by this court.