DOMENGEAUX, Judge.
This case involves a will contest between Rene Duplechin and the heirs of Lula and Sidney Duplechin, hereinafter referred to as plaintiffs, on one side, and Myra Duple-chin Lejeune, Elta Duplechin Bertrand, and Marie Duplechin Reed, hereinafter called defendants, on the other. The estate in dispute is that of Many Duplechin, sibling of all of the named parties, and uncle of the above referred to heirs of Lula and Sidney Duplechin, who departed from this world on April 27, 1970.
Before his demise Many Duplechin con-fected four separate wills bearing the dates of February 24, 1967, January 11, 1968, April IS, 1968, and December 12, 1968. Each of those contained different dispositions and the last one favored the defendants herein. Accordingly the plaintiffs sought to have it declared invalid alleging the testator’s mental incapacity at the time that he made the will.
There was a trial on the merits following which the district court held for defendants, finding that the testator was in fact competent when he executed the will in question and therefore upholding that will. The three previous wills were declared to be null and void, and of no effect. Plaintiffs appealed that judgment to this court, putting before us the question of whether the testator was mentally competent to confect the fourth will at the time that he did so. We think that he was.
Many Duplechin was some seventy-two (72) years of age when he died, on April 27, 1970, in Evangeline Parish. Pie and his wife, one Addie F. Fontenot, had no children and they lived alone in Mamou, Louisiana, for many years, until 1967, when Many was taken to Greenwell Springs Tuberculosis Hospital in East Baton Rouge Parish, and his wife was placed in an institution for the insane. He remained in Greenwell Springs Hospital for slightly less than a year and returning to Mamou, once more attempted to live with his wife. The conjugality was however, lacking in both quality and duration, and in November of 1968 Many moved into a mobile home placed in her yard by his sister, Myra. He lived there until a week or so before his death, when he was removed to a hospital for the treatment of burns sustained when a fire erupted in his mobile home.
There is considerable evidence contained in the record of behavior on testator’s part which would indicate a mentality less than stable. For example, it was said that he had a tendency to set fire to his bedding both while at Greenwell Springs and while living in the mobile home. There was, however, no evidence that he did so intentionally, and instead every indication is that this was the result of careless smoking.
While the testator was living with his mentally incompetent wife (she was interdicted) following his return from Green-well Springs, it was necessary for two of his sisters to go to his home on alternate days in order that their basic needs might be satisfied as neither he nor his wife were capable of caring for themselves.
*39 A fellow inmate of the tuberculosis hospital testified that he considered plaintiff mentally unsound because of his repeated ignition of his bed and because on one occasion, when he was let outdoors for a forty-five (45) minute period, he wandered off and far overstayed the allotted time, with the result that thereafter he would be allowed outdoors only with an escort. Additionally, he stated that the testator, in spite of his economic well being, was desirous of obtaining welfare assistance. In this connection we note that the testator was, besides the witness just mentioned, the only unilingual French-speaking inmate of the hospital. This, added to the home-sickness that he frequently evidenced and his age no doubt created some confusion, but we do not regard the events testified to as acts of lunacy.
Dr. Frank P. Savoy, Jr., the only physician who testified, stated that the testator was suffering from senility and that lucid periods were not probable. He admitted, however, that they were possible and that persons with his condition do in fact have lucid periods. He also said that he had seen the testator only about seven times over a two year period, presumably when he was at his lowest ebbs, and that he had never made a mental examination of him.
Finally, there was much testimony about the testator being miserly, talking about cattle he no longer owned as though he still had them, having no control of his bodily functions, crying frequently, and for the last two or three weeks of his life being given to irrational screaming.
Explanations for some of these items were forthcoming, for example, the cattle of which he spoke were said to be some that had been lost in the woods and never recovered. Others of the items covered do not seem to us to be so very unusual in a man of his advanced years suffering from arterio-sclerosis and tuberculosis. As for the screaming toward the end, it began several months after the last will was written.
On the other side of the scale we have the testimony of one Franklin L. Duple-chin, a cousin of the testator and an individual who had nothing to gain or lose by the outcome of these proceedings. He visited with the testator a short time after the will in question was confected and found him to be physically weak but of sound mind. Many Duplechin spoke to him of how he had made a will in favor of the defendants, explaining that they were caring for him in his illness. The two men reminisced about their childhood and the testator reminded his cousin of events that they had experienced in the past.
We have the testimony of the four witnesses to the will, all to the effect that the testator knew and understood what he was doing, though it is true that the witnesses were friends of the defendants. Finally, we have the testimony of two members of the Bar, the lawyers involved in the making of the third and the fourth wills respectively, and that of the notary public before whom the last will was confected. All three indicated that when they saw Many Duplechin he gave the appearance of a man who understood what he was doing, what its consequences would be, and whom it would affect.
Taking all of that evidence together, we cannot say that the trial judge committed manifest error in his factual conclusion that Many Duplechin executed the fourth and last will during a lucid interval. Its form being legally proper, that will is valid and must be given effect. La.Civil Code, Art. 1472; Succession of Ford, 151 La. 571, 92 So. 61. Succession of Bisso, 186 So.2d 692, and cases therein cited.
A problem arises, however, when we consider the terms of that testament, since it disposes only of an eighty acre tract of land forming part of the testator’s immovable property. Not mentioned are his remaining assets which form a considerable portion of his estate. Included among these are a home and lot in the town of Mamou, two savings accounts containing *40 some Ten Thousand ($10,000.00) Dollars, various promissory notes valued at some Five Thousand ($5,000.00) Dollars, etc. The will does not expressly revoke any prior wills and therefore it revokes them only insofar as its provisions are incompatible with those of the previous wills. La.Civil Code, Art. 1693; Succession of Tranchina, 144 So.2d 778. Accordingly, we must look to the previous wills to see what dispositions are made of the remainder of the property.
The will most proximate in time, that of April 15, 1968, which we shall call the third will, is in statutory form. All of the evidence indicates, however, that the testator could not read, or for that matter even speak, the English language in which it is written. This third will is therefore clearly null and void under the provisions of LSA-R.S. 9:2443 which reads thusly:
Except as provided in R.S. 9:2442 with respect to a testator who is physically unable to sign his name, those who know not how or are not able to sign their names, and those who know not how or are not able to read, cannot make dispositions in the form of the will provided for in R.S. 9:2442, nor be attesting witnesses thereto. Acts 1952, No. 66, § 2, as amended Acts 1964, No. 123, § 1.
Accordingly, will number three is null and void and therefore will be disregarded.
Will number two, dated January 11, 1968, was made at a time when the evidence shows and all of the parties to this suit agree, the testator was of unsound mind. It was, in fact, for the purpose of revoking will number two' that will number three which treated all of the parties fairly equally, was confected. Adding credence to the view that the testator was not possessed of his mental faculties at the time he made the second will is the fact that the primary beneficiary thereunder, and person accused of inducing the testator to dispose as he did, Roland Fruge, subsequently renounced all of the rights and claims that he might have had under the will by notarial act dated April 30th, 1970. We therefore conclude that will number two is null and void because of the testator’s lack of mental capacity at the time that he made it. La.Civil Code, Art. 1475.
This brings us to will number one, dated February 24, 1967, the validity of which no one questions. (We opine that the trial judge declared it null and void only through oversight, in that he overlooked the omission of a general revocation clause in the fourth will.) Therein the testator bequeathed all of his interest in the land, house, and all its furnishings located in Mamou, Louisiana, to his wife on condition that she give his blood relatives the sum of One Thousand, Two Hundred Fifty ($1,250.00) Dollars. He also provided for the payment of all of his debts, including his burial, out of his separate property other than that mentioned in the will.
No other dispositions are made in the first will, nor is any other property mentioned.
The dispositions of the fourth and last will are clearly, then, not in conflict with those of the first will and accordingly both the first and the last will must be admitted to probate. That portion of Many Duplechin’s property not disposed of in either of the valid wills should be distributed according to law.
For the above and foregoing reasons the judgment of the trial court is affirmed insofar as it recognizes the validity of the fourth will, dated December 12, 1968, and declares null and void the second and third wills dated January 11, 1968, and April 15, 1968, respectively. It is reversed insofar as it declares the first will, dated February 24, 1967, to be null and void and that will is hereby recognized as being possessed of equal validity with that of December 13, 1968. Costs in this and in the trial court are assessed in equal shares to both sides.
Affirmed in part, reversed in part, and rendered.