449 So.2d 32 (1984)
Sheldon D. BEYCHOK and Jo Ann Osborne Beychok
v.
Janet F. NORTON.
No. 83 CA 0428.
Court of Appeal of Louisiana, First Circuit.
February 28, 1984.
Rehearing Denied April 3, 1984.
*33 Gerald L. Walter, Jr., Baton Rouge, for plaintiffs-appellees Sheldon D. Beychok and Jo Ann Osborne Beychok.
M.J. Bodenhamer and Eric A. Kracht, Baton Rouge, for defendant-appellant, third party plaintiff Janet F. Norton.
Before COVINGTON, COLE and SAVOIE, JJ.
SAVOIE, Judge.
The issue in this case is whether or not the trial court erred in ordering a reduction in the purchase price of a house sold by defendant Janet F. Norton to plaintiffs Sheldon Beychok and Jo Ann Beychok.
The following facts led to this litigation. On February 27, 1981, the Beychoks purchased a house for $320,000 from Janet Norton and moved into it shortly thereafter. In the late spring or early summer, when the weather became warm, the Beychoks noticed the bedroom wing of the house was not being cooled adequately. Rebel Heating and Air Conditioning Service inspected the unit and informed them a large portion of the duct work was in a state of disrepair and needed to be replaced. The work was performed at a cost of $4,000. The Beychoks then filed this suit alleging the house contained redhibitory defects including the defective air conditioning system, a defective shower and other items not involved in this appeal.
After a trial on the merits the court found plaintiffs had proven by a preponderance of the evidence the defects existed at the time of the sale. The court did not elaborate as to the basis of its findings. Judgment was rendered in favor of plaintiffs and against defendant for $4,210. This sum represented the cost of replacing the duct work and repairing the shower.
On appeal Mrs. Norton contends the court erred in concluding plaintiffs proved the defects existed before the sale, as required by Louisiana Civil Code article 2530. She argues further the court erred in the amount awarded.
We deal first with the allegedly defective shower. Mrs. Beychok testified the leak in the shower manifested itself approximately one week after they moved into the house. She had observed water pouring from the overhead light fixture in the den. At trial, Aaron Gaspard, owner of A & T Plumbing and Heating, Inc., testified the leak emanated from a shower on the second floor. When he examined the shower he found a leaking drain which had been improperly repaired, i.e., someone had attempted to seal the drain from inside the shower with a silicone substance. He explained that the proper way to repair the drain (and the method he used) was to cut a hole in the ceiling below and seal it from underneath.
Mrs. Norton testified she had never noticed a leak in the shower and had no knowledge of anyone attempting to repair it.
The trial court awarded plaintiffs $210 for this item. (Mr. Gaspard charged $125 to repair the drain and a carpenter, Mr. McElwee, charged $85 to repair the ceiling.)
We find no error in the trial court's conclusion as to the shower. The fact that the leak manifested itself within a month of the sale and within a week of the Beychoks' *34 occupancy of the house makes it very probable the defect existed at the time of the sale. This theory is further corroborated by Mr. Gaspard's uncontradicted testimony that there had been a prior attempt to fix the drain. We agree with the trial court that these facts sufficiently support plaintiffs' claim that the shower was defective as of the date of the sale.
Concerning the allegedly defective air conditioner, Mr. Sheldon Beychok testified that when the weather got warm he noticed the house was not being cooled properly. He found it so uncomfortable at one point that he was unable to sleep.
Mr. Robert Graham, owner of Rebel Heating and Air Conditioning, was accepted by the court as an expert in heating and air conditioning repair. He explained the house had three heating and cooling units: Unit 1 serviced the bedroom area, unit 2 the kitchen area and unit 3 the upstairs rooms. Unit 2 was described as a fairly new unit and was in much better condition than the other two.
Mr. Graham found the majority of the problems to be with unit 1 and testified as to its condition as of June 1981. He examined the return air chase which was designed to draw air from the living area of the house and recirculate it throughout the system. He found the sheetrock, which formed the walls of the chase, was broken up and observed openings in the chase which allowed hot air to be sucked from the attic into the unit. He stated this condition caused cooling problems because the hot air greatly warmed the cool air traveling through the ducts. He repaired the chase by replacing the sheetrock. He stated the opening of the return air chase, at the point where it connected to the unit in the attic, was covered with a heavy accumulation of dust. According to Mr. Graham, the dust was caused by the hot dusty air from the attic entering the chase and had accumulated over a lengthy period of time.
The second problem found by Mr. Graham was badly deteriorated duct work. He explained the ducts for units 1 and 3 were made of flexible material. He described them as being formed by a spiral wire covered with an insulating material and a vinyl outer cover. He found the insulation and outer cover were torn in many places, with air escaping into the attic. They were also bent in several places and "just laying down on the rafters." Air was also escaping from the joints of the ducts which were "just half taped" rather than being screwed together. He attributed the condition of the duct work to its age, being of a "cheaper kind," and the original method of installation. The installation was poor because "the joints just had big gaps in them." He stated the condition was caused by deterioration rather than external trauma.[1] He remedied the problem by replacing all of the flexible duct work with rigid (metal) duct.
Other problems found with unit 1 were an improperly positioned coil and a clogged drain line. The coil was not elevated sufficiently and as a result was surrounded by water which had accumulated in the pan. Mr. Graham repositioned the coil to an adequate elevation and cleared the drain line.
Repairs to unit 2 were minor in nature and did not involve the replacement of duct work. He simply sealed around the return air chase, cleaned the cooling coils and made an adjustment to the drain.
The drain in unit 3 was also blocked. It had caused water to run down on the platform where the heater stood. The platform was deteriorating, indicating the drainage problem had existed for quite some time. Again, Mr. Graham found faulty duct board and noted "air was blowing all out into the attic."
Plaintiffs called as a witness Mr. Albert Mayers, Jr., an expert in mechanical engineering. Based on Graham's description of *35 the return air chase[2] Mr. Mayers agreed that the dusty condition was caused by leaks in the system and would have taken several years to occur.
Appellant, Mrs. Norton, testified she had never experienced any problems with the air conditioners when she lived in the house. She stated she had gone to the house several times after the Beychoks moved in and found the air conditioners turned so low that ice had formed on the windows.
She called two witnesses to corroborate her statement that the units worked properly as of the date of the sale. Roy Simoneaux, owner of Simoneaux's Welding and Repair Service, stated he had been in the attic in November of 1980, replacing a pump in the hot water system. He looked around the attic and saw no damage to the duct work nor any significant amount of air escaping from the system. He said he had repaired one leak around the "plenum" during the summer of 1980 and had also taped several leaks in the flexible duct work at the same time.
Martin Johnson, of Martin Johnson Service Company, was accepted by the court as an expert in air conditioning maintenance and repair. He testified he had serviced the units in the house for the past ten years and had installed unit 2. Mrs. Norton had called him in February of 1981, informed him she had a buyer for the house and requested he inspect the unit to make sure it was functioning properly. He did so and did not see any of the conditions described by Mr. Graham. He found the ducts to be in good shape and did not see "any tremendous air leakage."
Appellant contends since the testimony of these two witnesses is uncontradicted as to the condition of the duct work before the sale, the court must accept this testimony as true, citing Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967), rehearing denied 1967. She argues further that however weighty the opinion testimony (of Graham and Mayers) might be, it must yield when opposed to facts, citing Succession of Ford, 151 La. 571, 92 So. 61 (1922).
While we do not argue with the propositions set forth by the above cases, we feel it is inaccurate to describe the testimony as "uncontradicted." Granted, as to the condition of the duct work as of the date of sale, there is no direct evidence to refute the testimony of appellant's two witnesses. But we are not concerned here only with the condition of the duct work, but with the condition of the system as a whole. Neither of appellant's witnesses had examined the return air chase. Therefore, the testimony of Mr. Graham concerning the condition of the return air chase some three months after the date of the sale is uncontradicted. Mr. Graham's conclusion, supported by Mr. Mayers' testimony, is that the heavy accumulation of dust around the opening of the return air chase indicated there had been serious leaks in the system for quite some time. Appellant's own expert, Mr. Johnson, agreed a large accumulation of dust would indicate a leak in the plate where the duct sits. Both Graham and Johnson stated they did not believe such an accumulation could have occurred in less than three months. This testimony conflicts at least indirectly with that of Mr. Simoneaux and Mr. Johnson that the system was intact prior to the sale. Therefore, the trial court was faced with conflicting testimony and apparently concluded Mr. Graham's was the most credible.
Appellant devotes a great deal of time in her brief to the argument that the circumstantial evidence rule applies and the Beychoks did not exclude the hypothesis that the damage to the air conditioning system was caused by certain workmen who performed renovation work immediately after the sale. She alleges these workers were employees of the Beychoks and that an adverse presumption arose when they failed to call the workmen to testify at trial, citing Morgan v. Matlack, Inc., 366 *36 So.2d 1071 (La.App. 1st Cir.1979). We find no evidence proving the workers were employees of the Beychoks and note that the workers were equally available to each side. When a witness is available to either side, no inference or presumption will arise from a party's failure to call the witness. Jolivette v. City of Lafayette, 408 So.2d 309 (La.App. 3d Cir.1981), writ denied 413 So.2d 495 (La.1982).
Arguably, the circumstantial evidence rule does not apply in this case but even if we were to apply it, we reject appellant's argument concerning the workmen for two reasons. First Mrs. Beychok testified the "renovation" consisted mainly of superficial changes such a painting, wallpapering and other activities which would not involve workers entering the attic. Only one room was structurally altered. (A lower ceiling and additional lighting were installed in "Ben's room.") Although it is possible workmen could have damaged the duct work in that particular area, such an event would not explain the extensive damage throughout the attic described by Mr. Graham.
Second, if we were to assume the workmen were responsible for all of the damage to the duct work and even for the damage to the return air chase, it would not explain the large accumulation of dust which was apparent around the opening in the attic. Both Mr. Graham and Mr. Mayers stated unequivocally this condition could not have occurred in only a few months but had obviously developed over a long period of time. Their opinions as to the meaning of this physical evidence was unrefuted at trial and apparently accepted by the trial court. Therefore, for these reasons we are satisfied the evidence refuted the hypothesis that the damage was caused by the workmen.
After carefully considering all the evidence we conclude the trial court did not err in holding plaintiffs proved the defects in the air conditioning system existed as of the date of the sale. Although there was much conflicting testimony the court apparently accepted the testimony of Mr. Graham to be the most credible. Since the trial court is given great discretion in this area we will not disturb its reasonable evaluation of credibility and its reasonable inferences of fact, even though other evaluations and inferences are as reasonable. Aleman v. Lionel F. Favret Co., Inc., 349 So.2d 262 (La.1977), rehearing denied 1977.
Appellant argues alternatively that even if this court affirms the reduction in purchase price based on the redhibitory defects, the amount awarded should be reduced. The gist of appellant's complaint is that the flexible duct could have been repaired rather than replaced by the more expensive metal duct.
There was conflicting testimony as to the feasibility of patching the flexible duct work. Appellant's expert, Mr. Johnson, indicated the duct work could have been satisfactorily patched by sealing the holes with tape. Mr. Graham testified the condition of the duct work could have been helped by retaping but never completely corrected in that any such repairs would be only temporary measures. Mr. Mayer testified that taping the duct board and flexible duct was not a proper method of repair because any materials in the attic would be covered with dust and tape would not adhere well to the surface. The trial court apparently weighed the conflicting opinions and accepted those of plaintiffs' experts. We find no reason to disturb its conclusions here.
Appellant contends the court allowed the Beychoks to replace their "used Chevrolet" with a "new Cadillac," implying that the duct work in the house was near the end of its useful life and would had to have been replaced soon even without the alleged defects. However, appellant failed to offer any evidence at trial showing the life expectancy of the duct work. Mr. Graham testified that if installed properly, flexible duct work could last a long time. Although appellant urges the proper award would be the repair cost, rather than the replacement cost, she did not offer any *37 evidence as to how much it would have cost to repair the duct work.
We conclude there was no abuse of discretion in awarding plaintiffs the replacement cost for the duct work. Although the metal duct work may have cost more than the flexible type, there is nothing in the record concerning a difference in price.
For these reasons, the judgment of the trial court is affirmed. Appellant is to pay all costs.
AFFIRMED.
NOTES
[1] When questioned closely about whether the condition of the duct work was caused by deterioration or by someone stepping on it, he admitted someone could have stepped on one line, but stated, "It was not why I gave them an estimate to change it out."
[2] Mr. Mayers examined the unit immediately before trial. Although Mr. Graham had repaired the return air chase by that time, Mr. Mayers stated he did observe an accumulation of dust on the wall near the return air chase in the attic.